Arthur L. HINSON, Plaintiff,

v.

The UNITED STATES of
America, Defendant.

No. CV 396–48.

United States District Court,
S.D. Georgia,
Dublin Division.

Aug. 6, 1998.

Frederick S. Bergen, Savannah, GA, L. Robert Lovett, Macon, GA, Paul R. Ayerbe, Macon, GA, for Arthur L. Hinson, plaintiff.

Lawrence B. Lee, U.S. Attorney's Office, Savannah, GA, Delora L. Grantham, United States Attorney, for United States of America, defendant.

## ORDER

BOWEN, Chief Judge.

Before the Court in the above-captioned matter is the Government's Motion for Summary Judgment in this personal injury case arising under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.* Upon careful consideration of the briefs and the relevant law, it is hereby **ORDERED** that Defendant's Motion is **GRANTED** for the reasons stated herein.

## I. BACKGROUND

This matter arises from an incident on April 4, 1994, where Plaintiff, Arthur L. Hinson, slipped and fell down an unlighted stairway at Fort McClellan, Alabama. Hinson, a correctional officer with Georgia Department of Corrections, was attending a two-week instructional course to get certification as a boot camp instructor in the Georgia prison system. The Rehabilitation Training Instructor Course (RTIC) was conducted by members of the United States Army Drill Sergeant School at Fort McClellan and heavily emphasized physical training. This program was initiated in 1991 as part of the Secretary of Defense's directive to implement the Nation's drug control policy by providing training to non-profit civilian correctional institutions.

In 1993, Hinson's supervisor asked him to become a member of the boot camp staff. In order to become a member of the staff, Hinson had to attend several courses including the RTIC training at Fort McClellan. Although Hinson would not receive any additional compensation, he agreed to his supervisor's request. (Hinson Affidavit ¶ 4).

All RTIC expenses, including billeting, were paid by the Federal Government, and Hinson's salary and travel expenses were paid by the state of Georgia. As a prerequisite to attending RTIC, all attendees were required to sign a liability waiver releasing the Federal Government from all claims based upon injuries caused by or resulting from the RTIC training. Specifically, the waiver reads:

> [i]n consideration of training in the Rehabilitation Training Instructor Course (RTIC), I agree to release, protect, defend, indemnify, and hold harmless the United States government, its agents, servants, and employees from any and all claims, demands, actions, liabilities, judgments, costs, and attorney's fees arising out of, claimed on account, or in any manner predicated upon loss of, or damage to, property of or injuries to, or the death of, any or all persons whatsoever, including myself, in any manner caused or contributed by the United States government, its agents, servants, or employees of the United States *arising from, caused by or resulting from training in the RTIC. I further waive all actions or claims I might have against the United States arising from, causing by or resulting from my participation in the RTIC.*

(Defendant's Exhibit B, Deposition Exhibit 2) (emphasis added). Hinson read and signed the waiver. *Id.* at 51.

In April 1994, Hinson attended the RTIC. Upon his arrival at Fort McClellan, he was assigned an individual room in Building 141. Staying in the Post's billets was a course requirement. His training day began at 4:30 a.m. and ended at 5:00 p.m.

Unlike more traditional military training, there were no room inspections nor twenty-four-hour confinement to the same. Students at the end of the training day were released and "[b]y RTIC rules and regulations, students [were] permitted during the two-week period to utilize the Fort McClellan Post Exchange, the Base Bowling Alley, the local NCO Club, Base Gymnasiums, Barber Shop and Post Movie Theaters." (Joshua Perry Affidavit ¶ 9). Students would not otherwise have enjoyed these military privileges. *Id.*

Hinson states that during his orientation he was told that smoking was only allowed where there was an ashtray. On the first day, he noticed that there was an ashtray on the second floor balcony. This second floor balcony is located in an enclosed breezeway, and in 1994 served as the fire escape.

After training was over on the second day, Hinson went outside on the second floor balcony to smoke a cigarette. At approximately 9:15 p.m., he attempted to reenter the building and found that the door had locked behind him. Hinson states he then knocked on the door in order to get someone to let him back in, but no one answered. Since the door was locked, the only other way to exit the balcony was down the staircase that served as the fire escape. Hinson states, however, that the stairway's light was not functioning and that a bird had built a nest in it. After waiting "for a while," Hinson reluctantly proceeded down the dark steps to get off the balcony and back inside the building. (Plaintiff's Response at 3). There is no evidence that there were any obstructions on the steps or defects with the handrail. In fact, Hinson testified that he held the railing with one hand and proceeded cautiously down the stairs, one step at a time. (Hinson Deposition at 47). Halfway down the steps, Hinson "lost his footing and fell" injuring his back and arm. *Id.* As a result of his injuries, Hinson was unable to complete the course.

Subsequently, Hinson filed a claim for injuries with the Office of the Staff Judge Advocate, Fort McClellan, Alabama. The Department of the Army failed to make final disposition of the claim. On October 17, 1996, Hinson filed suit against the United States Government under the FTCA seeking $750,000.00 in damages. Hinson alleges that the United States Army was negligent in (1) failing to maintain the stairs properly, (2) failing to ensure proper lighting, and (3) failing to ensure proper ingress and egress to the building. (Complaint ¶ 8).

On November 10, 1997, the Government moved for summary judgment contending the liability waiver Hinson signed provided an absolute defense to liability under Alabama law. Alternatively, the Government contends that even if the waiver were invalid, as an invitee, Hinson should have exercised a greater degree of care because of the absence of lighting. Thus, the Government argues that it violated no duty to Hinson because the danger was open and obvious.

On April 13, 1998, the Court ordered the parties to develop the Record further because of concerns about the legality and scope of the waiver under Alabama law, and the extent of the public's use of the building in question. Both parties provided supplemental briefs and provided additional pictures of the building. After reviewing these supplements, the Court further directed the parties file supplemental briefs on the recent Alabama Supreme Court case *Ex parte Industrial Distribution Services Warehouse, Inc.,* 709 So.2d 16 (Ala.1997), concerning invitees and the law of "the step in the dark."

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Applicable sub-

stantive law determines which facts are material, that is, which facts have the potential to affect the outcome of the trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his [or her] favor." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks and citations omitted).

■ The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for its motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the nature of the movant's initial burden "varies depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, ... no reasonable jury could find for the non-moving party." *Four Parcels,* 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry its initial burden either by negating an essential element of the non-movant's case or by demonstrating that there is an absence of evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Merely stating that the non-movant cannot meet its burden at trial is insufficient. *Id.*

■ If—and only if—the movant carries the initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* at 608.[1] Again, this burden varies depending upon whether the movant or non-movant bears the burden of proof at trial. If the movant has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence sufficient to withstand a motion for directed verdict at trial. *Fitzpatrick,* 2 F.3d at 1116 (citation omitted). If the non-movant bears the burden of proof at trial, the non-movant's response must be tailored to the method by which the movant carried its initial burden. If the movant presented evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Id.* If the movant demonstrated an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant, or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* (citation omitted).

■ The clerk has given the non-moving party notice of the summary judgment motion, of the right to file affidavits or other materials in opposition, and of the consequences of default. Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822 (11th Cir.1985), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration.

### III. ANALYSIS

■ This case involves a claim of negligence against the United States. Under

---

**1.** The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross,* 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Fed.R.Civ.P. 56.

the principles of sovereign immunity, the United States Government cannot be sued for tort damages without its consent. Congress, through the FTCA, waived immunity to suit for civil actions

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, *if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.*

28 U.S.C. § 1346(b) (emphasis added). Accordingly, for Plaintiff to recover under the FTCA, a private cause of action must exist under Alabama law—the place where the alleged tort occurred.

## A. *WAIVER*

The Government first contends that the liability waiver Hinson signed provided an absolute defense to liability under Alabama law. This contention presents two questions: (1) whether the waiver is *valid;* and (2) if so, whether the *scope* of the waiver covers this incident.

The Alabama courts have consistently held that "the right of freedom of contract is a cherished one that courts are bound to protect," *Sutton v. Epperson,* 631 So.2d 832, 833 (Ala.1993) (citing Am.Jur.2d, *Contracts* § 178 (1991)), and they are reluctant to hold contracts unenforceable on the basis of public policy unless they are clearly illegal. *Id.* In *Morgan v. South Central Bell Telephone Co.,* 466 So.2d 107, 117 (Ala.1985), the Alabama Supreme Court stated that in determining whether an exculpatory clause is illegal "the best rule, and the simplest in application, is that exculpatory clauses *affecting the public interest* are invalid." (emphasis added).

The *Morgan* court outlined six criteria to be examined in deciding whether the clause affects the public interest. An exculpatory clause is invalid when:

[1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some member of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract or exculpation, and makes no provision whereby a purchaser may pay additional fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Id.* (quoting *Tunkl v. Regents of the University of California,* 60 Cal.2d 92, 99–101, 32 Cal.Rptr. 33, 383 P.2d 441 (1963)). While I question the validity of the waiver signed by Hinson under the *Morgan* analysis, it is unnecessary to make that determination because the scope of the waiver clearly does not cover this incident.

The Government's attempt to stretch the coverage of the waiver to the fall within the billets is unavailing. If the waiver were valid, it would clearly cover activities related to the physical training instruction such as injuries from the obstacle course or heart-attacks from overexertion. The mere fact that participants were required to stay in government billets does not make "billeting" part of the training. The purpose of the course was to provide instruction on physical fitness training, not

on how to make a bed properly or organize a footlocker.

The Government's position is that the billeting is part of the participation or training, and thus *any* incident arising in the billets is covered by the waiver. However, the Government does not argue that the waiver covers any incident on Fort McClellan, and concedes that if Hinson fell in an uncovered manhole on the way to see a movie at the Post Theater, the waiver would not apply. The Government's position creates the illogical situation where the coverage of the waiver would depend on Hinson's location when he was injured. If the training day was over and Hinson was leaving the billets to see a movie at the Post Theater and fell because of a defective sidewalk a few steps outside the billets, the waiver would not indemnify the Government. However, if Hinson fell on a defective doorstep as he left the billets en route to the same movie, the waiver would apply. This illogical situation reemphasizes the fact that the "billeting" is truly not part of the RTIC *training.* Accordingly, I find that the scope of the waiver, if valid, would not include this injury unrelated to the physical fitness training.

## B.  *HINSON'S STATUS*

■■■ "In Alabama the duty owed by a landowner to a person on the landowner's property varies greatly, based upon the classification of the person on the property." *Shelton v. Boston Financial, Inc.,* 638 So.2d 824, 825 (Ala.1994). Alabama has three classifications: (1) invitee; (2) licensee; and (3) trespasser. "The highest duty is owed to invitees." *Id.* The Government contends that Hinson is a licensee; however, for the purposes of this Motion, I will assume that Hinson is an invitee.[2]

■ A landowner owes an invitee the legal duty "to maintain the premises in a reasonably safe condition, or if it is unsafe, to warn of all hidden defects and dangers which are known by it, but which are unknown by, or are not such as ought to be known by, the invitee." *Bush v. Alabama Power Co.,* 457 So.2d 350, 354 (Ala. 1984). The Government contends that the unlighted fire escape was an open and obvious danger, and thus it was unreasonable for Hinson to continue down the dark staircase.

### 1.  *Step In The Dark*

■ "It is well established ... that an invitor is not liable for injuries to an invitee resulting from a danger that was known to the invitee or that the invitee should have observed through the exercise of reasonable care." *Ex parte Industrial Distribution Services Warehouse, Inc.,* 709 So.2d 16, 19 (Ala.1997). *See also Owens v. National Security of Alabama,* 454 So.2d 1387 (Ala.1984). Thus, "[i]f the danger is open and obvious, the invitor cannot be held liable. Total darkness, possibly concealing an unseen and unknown hazard, presents an open and obvious danger to someone proceeding through unfamiliar surroundings, as a matter of law." *Id.* (citations omitted).

In *Industrial Distribution,* the plaintiff was the owner of a company that cleaned up chemical spills. The defendant property owner had hired the plaintiff to pump out a flooded warehouse basement containing chemicals. The basement was flooded as a result of a winter storm that had caused significant roof damage. The plaintiff was supposed to meet the defendant at the warehouse to make final arrangements for the contract.

**2.**  A licensee is " 'a person who visits a landowner's property with the landowner's consent or as the landowner's guest but with no business purpose.' In contrast ... '[a] person who enters the land with the landowner's consent to bestow some material or commercial benefit upon the landowner is deemed an invitee.' " *Ex Parte Wooten,* 681 So.2d 149, 150 (Ala.1996) (quoting *Hambright v. First Baptist Church–Eastwood,* 638 So.2d 865 (Ala.1994)).

When the plaintiff arrived, there were several emergency vehicles present. He was informed that there was no electricity as a result of the storm. Instead of waiting for the defendant property owner to arrive, plaintiff followed a fireman into the building. The fireman had a flashlight, but the plaintiff did not. At some point, plaintiff became separated from the fireman by approximately fifty feet when the fireman left him to get his supervisor. Unfortunately, the plaintiff took a step and fell off a loading dock hidden by the darkness and was injured.

In its analysis, the *Industrial Distribution* court noted that "the condition that caused [plaintiff]'s injury (the loading dock) was hazardous only because of the darkness." *Id.* at 20. That too is the case here. Hinson has not presented any evidence that the stairs were defective. In fact, Hinson testified that he used the same stairs twice during daylight hours without incident. (Hinson's Deposition at 45–46).

█ The general rule applies even when an invitee exercises "due care to avoid injury because the focus of [Alabama's] premises liability law is not on the care that may have been exercised by the invitee." *Id.* Instead, the focus is on "relieving a premises owner of legal liability where an invitee knew of the danger that caused the injury or should have observed that danger through the exercise of reasonable care." *Id.* at 21. Thus, although Hinson proceeded cautiously down the darkened steps, the general rule still applies.

█ There are, however, exceptions to the above general rule. *Nayman v. Tracey*, 599 So.2d 604 (Ala.1992). When a person has a compelling reason to proceed through a dark premises, he or she may not be negligent as a matter of law. *See id.* The courts have generally applied this exception in two situations: (1) emergen-

cies; and (2) in the landlord-tenant context.[3] *Nayman*, 599 So.2d at 606 (tenant pursuing a thief); *Vick v. H.S.I. Management, Inc.*, 507 So.2d 433 (Ala.1987) (tenant returning to her apartment); *see also* 62A Am.Jur.2d, *Premises Liability* § 864.

In *Vick*, an apartment tenant was injured when she fell from some stairs in an unlighted common area. 507 So.2d at 435. The Supreme Court of Alabama held that the fact that she attempted to traverse the stairs in the dark did not bar her claim as a matter of law, but that the "open and obvious danger" defense was a factual determination for the jury. *Id.* The basis for the landlord-tenant exception is best expressed in *Carey v. Bradford*, 218 Ga.App. 325, 461 S.E.2d 290 (1995) where the Georgia court stated that

> [w]here a portion of leased premises is dangerously out of repair and such condition is known to the tenant who continues to use that area, the tenant cannot recover from the landlord for damages resulting from the condition; but the severity of the doctrine of assumption of risk has been ameliorated in cases where its application would make the plaintiff "a captive" in his own home. When the dangerous area is the plaintiff's only access or only safe or reasonable access to his home, the tenant's equal knowledge of the danger does not excuse the landlord of damages caused by his failure to keep the premises in repair.

*Id.* (citations omitted). Here, Plaintiff argues the "step in the dark" rule does not bar his claim as a matter of law because (1) the case law concerning landlords and tenants should apply to his situation, and (2) the Government created a trap which "forced" him to proceed down the unlighted stairs.

█ It is clear from the case law that Hinson was not in a landlord-tenant relationship. "An invitee is a visitor, a

---

**3.** "With respect to the common areas of an apartment complex, a tenant has the same

legal rights as an invitee." *Shelton,* 638 So.2d at 825.

transient who enters property at the express or implied invitation of the owner or occupier for the material or commercial benefit of the occupier." *Osborn v. Brown*, 361 So.2d 82, 87 (Ala.1978). On the other hand, a tenant "does not merely visit, but acquires an interest in the property, including the exclusive legal possession of the leased premises." *Id.* (citing *Rehfuss v. McAndrew*, 250 Ala. 55, 33 So.2d 16 (1947)). Thus, the two Alabama cases making an exception to the "step in the dark" rule are inapplicable, and I find no reason to expand their application to this situation.

██ The second theory Plaintiff relies on for departing from the general rule is that he was trapped, and therefore "forced" to proceed down the unlighted stairs. This argument, however, is hyperbolic. Hinson has not presented any evidence that he was *forced* to proceed down the stairs. Hinson could have waited until someone saw or heard his plight. No emergency existed that would justify proceeding down the unlighted stairs. Plus, there is no evidence of a hazard other than darkness, into which he chose to proceed. This case is a classic example of a plaintiff making a conscious choice to proceed into a dark, and thus possibly dangerous place. Accordingly, I find no reason to deviate from the general rule.

Upon the foregoing, it is hereby **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED.** The Clerk is instructed to close this case and ENTER FINAL JUDGMENT in favor of the Defendant. Costs are taxed against Plaintiff.