968 A.2d 1205 (2009)
406 N.J. Super. 608
Raymond MARCINCZYK and Erin Marcinczyk, Plaintiffs-Appellants,
v.
STATE OF NEW JERSEY POLICE TRAINING COMMISSION, Defendant, and
County of Somerset, Somerset County Police Academy, Raritan Valley Community College, Executive Director Richard Celeste, Detective Lieutenant Peter Lubas, Detective John Russo, Detective Judith Polhill and Detective William Loften, Defendants-Respondents.
No. A-4340-07T3
Superior Court of New Jersey, Appellate Division.
Argued February 25, 2009.
Decided April 24, 2009.
*1207 Kenneth W. Thomas argued the cause for appellants (Lanza & Lanza, attorneys; John R. Lanza, of counsel; Mr. Thomas and John E. Lanza, on the brief).
Scott D. Rodgers, Somerville, argued the cause for respondents (County of Somerset Office of the County Counsel, attorneys; Mr. Rodgers, on the brief).
Before Judges CUFF, FISHER and C.L. MINIMAN.[1]
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we conclude that an exculpatory agreement executed by a police trainee is valid and enforceable in that it serves a valid public concern, does not negate a statutory duty, and is not unconscionable. We also hold that plaintiff's claim for damages based upon personal injuries sustained during the training program fell within the agreement's scope, and, as a result, we affirm the summary judgment entered in favor of defendants.

I
Plaintiff Raymond Marcinczyk (plaintiff), and his wife, filed this action seeking damages resulting from injuries plaintiff sustained during the course of police training at the Somerset County Police Academy.
Plaintiff had been employed by the University of Medicine and Dentistry of New Jersey (UMDNJ) in another position when he became a UMDNJ security officer at or about the beginning of 2003. In November 2003, plaintiff was promoted to the position of police intern with UMDNJ with the understanding that he would be sent to *1208 a police academy for training. UMDNJ selected Somerset County Police Academy for plaintiff's training.
The record indicates that the Academy is operated by the Somerset County Prosecutor's Office at Raritan Valley Community College. Dr. Richard Celeste, who has been named as a defendant, is the Academy Director. The other individual defendants were supervisors of police training at the time of the incident in question; these supervisors were provided by the Somerset County Sheriff's Office.
Plaintiff alleged he was designated as one of two "lunch recruits," which meant that he and another trainee were required to carry a seventy-pound cooler containing the lunches of all recruits from location to location during the course of the training program. Plaintiff claims that on February 2, 2004, while he and the other lunch recruit were rapidly proceeding up a staircase with the cooler, he slipped and fell, causing back injuries.

II
To attend the Academy, plaintiff was required to execute what was labeled a "Save Harmless Agreement," which contained provisions representing that plaintiff was covered by medical benefits, expressing plaintiff's understanding that he could "stop and leave the training" program at any time, and confirming plaintiff's willingness and ability to participate in "all aspects of training." This exculpatory agreement also included the following provisions:
I understand that certain aspects of the training at the Somerset County Police Academy present a risk of possible physical or psychological injury. Nevertheless, I choose voluntarily to participate in these programs.
. . . .
In consideration of all of the above, I agree for myself, my heirs, dependents or personal representatives not to assert any claim or suit for money damages against the County of Somerset, Office of the County Prosecutor, the Somerset County Police Academy or it's [sic] personnel, for pain or suffering, medical expenses, loss of wages, injuries, permanent disabilities or pecuniary losses by reason of any injuries or losses I or my heirs or dependents may sustain during or as a result of my training or participation in activities conducted by the Somerset County Police Academy.
Defendants moved for summary judgment, arguing that this exculpatory agreement required dismissal of the complaint. Defendants also asserted their immunity from this suit based on the Tort Claims Act, N.J.S.A. 59:1-1 to 12-3, and that the facts as alleged by plaintiff do not support a viable claim of negligence. The motion judge agreed with all those arguments and granted summary judgment dismissing the complaint.
Plaintiff has appealed, arguing that: the exculpatory agreement is unenforceable or, even if enforceable, does not encompass his claim; N.J.S.A. 59:2-3 does not immunize defendants from suit; and whether defendants were negligent was a question for the jury and not amenable to summary judgment. Because we conclude that the exculpatory agreement is enforceable and encompasses plaintiff's claim, we affirm without finding it necessary to reach plaintiff's other arguments.[2]

III
Plaintiff's position on the exculpatory agreement is twofold. He argues that the *1209 agreement is unenforceable as a matter of law but that, even if enforceable, the agreement does not encompass the claim of negligence asserted here. We reject both these contentions.

A
We start with an understanding that exculpatory agreements "have long been disfavored in the law because they encourage a lack of care." Hojnowski v. Vans Skate Park, 187 N.J. 323, 333, 901 A.2d 381 (2006). That does not suggest, however, a blanket prohibition on their enforcement. "It is fundamental that parties to a contract may allocate risk of loss by agreeing to limit their liability as long as the limitation does not violate public policy" or does not "adversely impact the public interest." Chemical Bank v. Bailey, 296 N.J.Super. 515, 526-27, 687 A.2d 316 (App.Div.), certif. denied, 150 N.J. 28, 695 A.2d 671 (1997).
As a result, courts have refused to enforce such agreements "if the party benefiting from exculpation is subject to a positive duty imposed by law or is imbued with a public trust, or if exculpation of the party would adversely affect the public interest." Id. at 527, 687 A.2d 316. See also Mayfair Fabrics v. Henley, 48 N.J. 483, 487, 226 A.2d 602 (1967); McCarthy v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 48 N.J. 539, 543, 226 A.2d 713 (1967); Hy-Grade Oil Co. v. New Jersey Bank, 138 N.J.Super. 112, 116, 350 A.2d 279 (App.Div.1975), certif. denied, 70 N.J. 518, 361 A.2d 532 (1976); Kuzmiak v. Brookchester, Inc., 33 N.J.Super. 575, 580, 111 A.2d 425 (App.Div.1955). And our courts will not enforce an exculpatory agreement that would "release tort liability resulting from intentional or reckless conduct." Hojnowski, supra, 187 N.J. at 333, 901 A.2d 381 (citing Kuzmiak, supra, 33 N.J.Super. at 580, 111 A.2d 425). But, it does not follow, as plaintiff seems to suggest, that agreements that release liability arising from negligent conduct are unenforceable.
Although such agreements are disfavored and, when ambiguous, strictly construed against the party relying on them, our courts will nevertheless enforce exculpatory agreements that "do not adversely affect the public interest." Mayfair Fabrics, supra, 48 N.J. at 487, 226 A.2d 602. Applying this approach, it is understood that the "public interest" is not implicated by enforcement of an exculpatory agreement against a party who has executed the agreement in order to engage in a recreational activity. See, e.g., McBride v. Minstar, Inc., 283 N.J.Super. 471, 490, 662 A.2d 592 (Law Div.1994), aff'd sub nom., McBride v. Raichle Molitor, U.S.A., 283 N.J.Super. 422, 662 A.2d 567 (App.Div.), certif. denied, 143 N.J. 319, 670 A.2d 1061 (1995). In Hojnowski, the Court impliedly reached the same conclusion.[3]
Instead, the "public interest" is implicated where the exculpatory agreement is obtained in exchange for a necessary service or commodity of great import. For example, courts will not enforce an exculpatory agreement when it is demanded by a hospital prior to treating a patient, Tunkl v. Regents of Univ. of Cal., 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441, 447 (1963), or when included in a residential apartment lease during a housing *1210 shortage, Kuzmiak, supra, 33 N.J.Super. at 587-88, 111 A.2d 425.
In Gershon v. Regency Diving Center, 368 N.J.Super. 237, 248, 845 A.2d 720 (App.Div.2004), another panel of this court held that four criteria must be met before an exculpatory agreement will excuse a party's negligence. The panel referred to the three circumstances, which we have already mentioned  "(1) it does not adversely affect the public interest; (2) the exculpated party is not under a legal duty to perform; [and] (3) it does not involve a public utility or common carrier"  as well as a fourth, "the contract does not grow out of unequal bargaining power or is otherwise unconscionable." Ibid.
As for the fourth circumstance mentioned in Gershon, it is well understood that an unconscionable exculpatory clause will not be enforced, see Hojnowski, supra, 187 N.J. at 333, 901 A.2d 381 (which observed, in quoting Lucier v. Williams, 366 N.J.Super. 485, 491, 841 A.2d 907 (App.Div.2004), that "courts have not hesitated to strike limited liability clauses that are unconscionable ..."), but it does not follow, as may be suggested by Gershon's fourth factor, that disparate bargaining power alone will require the striking of exculpatory agreements. Because it would be the rare case in which the exculpated party was in a weaker bargaining position, broad application of that factor would literally swallow the rule and every exculpatory agreement would necessarily be rendered unenforceable. To the extent that this is what Gershon intended, we disagree. Certainly, the relative bargaining strength of the parties plays a role in determining whether a contract is unconscionable, see, e.g., Delta Funding Corp. v. Harris, 189 N.J. 28, 40, 912 A.2d 104 (2006); Muhammad v. County Bank of Rehoboth Beach, Del., 189 N.J. 1, 15-16, 912 A.2d 88 (2006), cert. denied, 549 U.S. 1338, 127 S.Ct. 2032, 167 L.Ed.2d 763 (2007); Sitogum Holdings, Inc. v. Ropes, 352 N.J.Super. 555, 564-65, 800 A.2d 915 (Ch.Div.2002), but it does not follow that all contracts between parties of unequal bargaining power are unconscionable. We thus reject plaintiff's argument that Gershon requires that courts should strike down all exculpatory agreements between parties of disparate bargaining power.
Based upon this understanding of our jurisprudence, we examine the exculpatory agreement in question here to determine whether its enforcement: (1) negatively impacts the public interest; (2) would absolve the Academy of a legal duty; or (3) is unconscionable.[4]

1. The Public Interest

The exculpatory agreement under review impacts the public interest but only in a way that favors enforcement.
The Legislature adopted the Police Training Act, N.J.S.A. 52:17B-66 to -77.6, and made it a requirement that "no person... be given or accept a permanent appointment as a police officer unless such person has successfully completed a police training course at an approved school." N.J.S.A. 52:17B-68. In enacting these laws, the Legislature declared that the State's interest in the training of law enforcement officers is necessary "to better protect the health, safety and welfare of its citizens," and, among other things, that
police work, a basic adjunct of law enforcement administration, is professional in nature, and requires proper educational and clinical training in a State whose population is increasing in relation to its physical area, and in a society where greater reliance on better law enforcement through higher standards of efficiency is of paramount need.

*1211 [N.J.S.A. 52:17B-66.]
The Academy is an approved school within the meaning of the Police Training Act and, accordingly, is operated to produce competent police officers. The certification provided by defendant Celeste in support of defendants' motion for summary judgment outlined the rigorous activities included in this twenty-four-week training program:
5. The core curriculum units of instruction at [the Academy] requires recruits to successfully perform the following tasks which require strength and endurance:
(a) Handcuffing;
(b) Unarmed defense;
(c) 75-lb. dummy drag;
(d) Fence drill (jump over fence to pursue individual);
(e) Pull-ups;
(f) Dips;
(g) Chin-ups;
(h) Push-ups;
(i) Squat thrusts;
(j) Mountain climbers;
(k) PR 24 and nightstick training;
(l) Confrontation simulation (boxing);
(m) Extraction drill (pulling downed officer out of harms way); and
(n) First responder water safety.
6. Additionally, during the course of training, recruits are given assignments to complete a variety of physical tasks to include, but not be limited to, the following:
(a) Carrying of personal gear;
(b) Carrying of five-gallon bottles of water (approximately 42.5 lbs. each) to areas of need;
(c) Carrying of self-defense mats;
(d) Moving into place 200 lb. striking dummies;
(e) Carrying boxes of copy paper to needed areas (approximately 52 lbs. each);
(f) Carrying of classroom furniture to areas of need;
(g) The set-up and breakdown of classroom tables;
(h) Carrying of four foot wooden barricades for use at the Shooting Range;
(i) Carrying and dumping of 55 gallon drums of garbage into dumpster at Shooting Range;
(j) Carrying bags of lime to line the Shooting Range;
(k) Carrying traffic cones;
(l) Carrying fire extinguishers;
(m) Carrying first responder gear;
(n) Carrying water safety gear;
(o) Changing tires at Driving Range;
(p) Removing spare tires at Driving Range;
(q) Carrying crates of equipment (practical day setting up scenarios); and
(r) Carrying a lunch cooler (approximately 70 lbs.) with another recruit.
Celeste asserted, without contradiction, "that law enforcement officers may be called upon to perform many important and potentially physically demanding and dangerous tasks at any time during their career," and that "to adequately prepare [Academy graduates] to perform these tasks, the law enforcement training at [the Academy] is necessarily demanding in many ways including that of a physical nature."
The training program obviously benefits the public interest. In this setting, the inclusion of an exculpatory agreement  which is not prohibited by the Police Training Act[5]  has the salutary effect *1212 of shielding those involved in providing that important service from the time and expense of defending against personal injury claims likely to accrue from the very nature of the training program.[6] In this same vein, striking down the exculpatory agreement could have a deleterious effect on these highly important training programs. Barring exculpation from claims could result in a lessening of the rigorous nature of the program and cause those who run the program to act out of a concern for lawsuits rather than effective preparation of competent law enforcement officers.
Although our courts have not previously considered the enforceability of an exculpatory agreement in this or any other similar context, we do not find similarities in those situations where exculpatory agreements have been stricken because of the public interest. The experiences of our courts with exculpatory agreements have largely been on opposite ends of the spectrum. That is, we have considered and negated these agreements when extracted from an individual seeking a necessity, such as a place to live during a housing shortage, Kuzmiak, supra, 33 N.J.Super. at 587, 111 A.2d 425. See also Horelick v. Pa. R.R. Co., 13 N.J. 349, 357, 99 A.2d 652 (1953) (holding it against public policy for a common carrier "to stipulate for exemption of liability in the event its negligence results in injury to its passengers"); Tunkl, supra, 32 Cal.Rptr. 33, 383 P.2d at 447 (holding it against public policy for a hospital to extract an exculpatory agreement from its patients prior to treatment). On the other hand, we have enforced exculpatory agreements when obtained from an individual seeking to engage in a recreational activity, such as skiing, McBride, supra, 283 N.J.Super. at 490-91, 662 A.2d 592, or skateboarding, Hojnowski, supra, 187 N.J. at 348 n. 1, 901 A.2d 381 (dissenting opinion).[7] We have generally described only the former category as involving a "necessity" that implicated the public interest; recreational exculpatory agreements do not implicate the public interest.
We recognize that the exculpatory agreement under review does not neatly fit either of the extreme categories our courts have encountered in the past. The opportunity to obtain police training is neither a necessity nor a pasttime. Nevertheless, we conclude that the agreement does not negatively impact the public interest because the agreement prevents the eroding impact of potential lawsuits from interfering with the police training. There is a public interest in conducting a physically rigorous training program that effectively prepares recruits for police work that could be hampered by a concern for claims or lawsuits for personal injuries. Because the public has an interest in maintaining demanding standards for police training, as evidenced by the Police Training Act, *1213 we find no public interest hostile to such agreements in this setting.[8]

2. The Absence of A Legal Duty

In arguing that the exculpatory agreement should be found unenforceable, plaintiff also contends that defendants were under a legal duty to protect trainees from harm.
In defining this particular limitation, it has been recognized that a contracting party may not avoid a "positive duty imposed by law" through the extraction of an exculpatory agreement. Chemical Bank, supra, 296 N.J.Super. at 527, 687 A.2d 316. For example, the Court in McCarthy emphasized that it is a statutory duty that may not be avoided through an exculpatory agreement. 48 N.J. at 543, 226 A.2d 713. In McCarthy, the plaintiff entered a NASCAR race with an uninspected vehicle and was required, as part of his entry, to execute an exculpatory agreement. The plaintiff's injuries were inflicted when, after crossing the finish line, his vehicle burst into flames due to an unshielded fuel line in the driver's compartment. Id. at 541, 226 A.2d 713. The Department of Law and Public Safety was legislatively charged with promulgating regulations "to protect participants in and spectators attending" such races; one of these regulations prohibited participating vehicles from having a fuel line in the "driver's compartment unless properly shielded by metal." Ibid. (quoting N.J.S.A. 5:7-14). The Court held that the exculpatory agreement extracted by NASCAR could not preclude plaintiff's claim for damages because NASCAR could not validly attempt to absolve itself from its affirmative legal duty to bar participants whose vehicles failed to comply with the adopted regulations.
A fair reading of McCarthy and all that has followed reveals that exculpatory agreements, which are extracted in an attempt to insulate a failure to comply with a duty imposed by law, will be stricken. But that principle has not been applied to rules of conduct that do not carry the weight of public policy found in a legislatively based mandate. See, e.g., Brough v. Hidden Valley, Inc., 312 N.J.Super. 139, 155, 711 A.2d 382 (App. Div.1998).[9] Thus, a general duty of care owed to those at a foreseeable risk of *1214 injury will not preclude enforcement of an exculpatory agreement.
In seeking to demonstrate that the exculpatory agreement's application here would absolve the Academy of a duty imposed by law, plaintiff has first referred us to the Academy's Guidebook, which declares that instructors must consider "the health and well being of the police recruit as the number one priority and the training mission a distant second." This unspecific expression of a concern for trainee safety does not have the force of law because it is contained neither in the Police Training Act nor the regulations adopted pursuant to the Act. Plaintiff also has referred to the guidelines that purport to have been adopted by the Police Training Commission pursuant to the Police Training Act, which stated at the time that instructors:
 "must also zealously protect the health and safety of each trainee who is undergoing instruction";
 have the "primary responsibility ... to ensure the safety of trainees who are under their immediate care and supervision"; and
 shall not require a trainee "to engage in training activities on any surface that is likely to cause injury or unnecessary comfort."
These guidelines are not contained in the New Jersey Administrative Code, nor do they appear in the website devoted to informing the public as to the scope of police training in this State[10]; as a result, the record does not clearly indicate whether they have the weight of statutory authority required by McCarthy and its progeny.
However, even if we were to assume these guidelines were imposed through the exercise of delegated legislative authority, we do not view them in the same way as the Court viewed the regulations considered in McCarthy, where the plaintiff's vehicle had an unshielded fuel line contrary to a specific regulation promulgated by the Department of Law and Public Safety in that regard. 48 N.J. at 542-43, 226 A.2d 713; see also Brough, supra, 312 N.J.Super. at 150, 711 A.2d 382 (where the ski slope operator failed to comply with the statutory obligation, contained in N.J.S.A. 5:13-3(a)(3), to "[r]emove ... obvious, manmade hazards," similar to that which caused plaintiff's injury). That is, the statements adopted for application by police instructors merely acknowledge an interest in safety during the course of instruction. They form a general statement that instructors should be careful; they do not constitute a "positive duty imposed by law" or affirmative legislative direction that precludes enforcement of an exculpatory agreement. Again, as we have already explained, it would be a poor excuse for police training to allow an overabundance of caution for the comfort of trainees to be the sole guidepost in the important goal of producing able and competent law enforcement officers. The fact that there may be one or more regulations that remind police instructors to exercise care does not impose the type of "positive duty" that may not be negated by an exculpatory agreement.
We emphasize, however, that we would view the matter differently if a specific affirmative regulation applied to plaintiff's circumstances. For example, if plaintiff suffered a head injury while engaging in nightstick training without a helmet  and a regulation prohibited instructors from requiring trainees to engage in nightstick training without a helmet  that would be an area of negligence to which the Academy's exculpatory agreement would not apply. In other words, a helmet requirement would be the type of "positive *1215 duty" that would preclude enforcement of an exculpatory agreement, not, as here, a guideline or regulation merely urging police instructors to conduct safe training.

3. Unconscionability

In arguing the exculpatory agreement is unenforceable, plaintiff refers to the parties' unequal bargaining power and the Academy's acknowledgement during discovery proceedings that if plaintiff had refused to sign the agreement, he would have not been permitted to attend the training program. Indeed, the record certainly supports plaintiff's position that the Academy viewed the matter as nonnegotiable. And we will assume, although the record does not provide an answer, that this training is not available from any academy absent execution of an exculpatory agreement.
As we have already indicated, unequal bargaining power is not the test that governs the enforceability of an exculpatory agreement. The question is whether the agreement is unconscionable. That question turns on a consideration of what has been referred to as procedural and substantive unconscionability. See Delta Funding, supra, 189 N.J. at 39-40, 912 A.2d 104. Procedural unconscionability requires examination of "unfairness in the formation of the contract" while substantive unconscionability considers whether the contract's terms are "excessively disproportionate." Sitogum Holdings, supra, 352 N.J.Super. at 564, 800 A.2d 915. In ascertaining whether a contract is unconscionable, these substantive and procedural aspects are subjected to a sliding-scale analysis, Delta Funding, supra, 189 N.J. at 40, 912 A.2d 104 (citing Sitogum Holdings, supra, 352 N.J.Super. at 565-66, 800 A.2d 915).
Plaintiff has contributed nothing to this sliding-scale analysis other than unequal bargaining power. That fact is far outweighed by the substantive content of the overall contractual undertaking between these parties. The Court held in Rudbart v. North Jersey District Water Supply Commission, 127 N.J. 344, 356, 605 A.2d 681, cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L. Ed.2d 145 (1992), that along with disparate bargaining power, there must be a consideration of "the subject matter of the contract, ... the degree of economic compulsion motivating the `adhering' party, and the public interests affected by the contract."
As we have determined, the public interest favors enforcement. In addition, the situation does not present the degree of economic compulsion that has militated against enforcement in other circumstances; unlike the necessities that would have been withheld in the absence of the execution of the exculpatory agreement in Kuzmiak and Tunkl, the contract here emphasized the rigors of the training and plaintiff's right to walk away from the program at any time. Plaintiff was never compelled to face any circumstance he viewed as hazardous, uncomfortable or even demeaning.[11] Plaintiff remained free to decline participation in the demanding training program without economic consequence.[12]
*1216 For these reasons, we reject plaintiff's argument that the exculpatory agreement was per se invalid.

B
Plaintiff argues in the alternative that the exculpatory agreement does not encompass his claim of defendants' negligence. We disagree.
Although the word "negligence" does not appear in the document, the parties' exculpatory agreement expressly encompasses "any claim or suit" for damages of the type sought by plaintiff and his wife for injuries sustained "during or as a result of [plaintiff's] training or participation in activities" conducted by the Academy. Plaintiff alleged he was injured when he and another recruit carried a cooler up a staircase on their way to one of the training sessions. Plaintiff alleged in the complaint that defendants acted "negligently, carelessly and/or [sic] recklessly," but he did not argue in opposition to summary judgment that defendants acted recklessly, as a basis for avoiding the consequences of the exculpatory agreement.[13]
Plaintiff has argued that the act of carrying a cooler should be viewed as hazing or something punitive and not part of the training program. The record demonstrates that the carrying of the cooler to and from training sessions was expressly designated as an aspect of training, and was akin to other preparatory actions such as the moving of tackling dummies, self-defense mats, classroom furniture and other equipment. Regardless of plaintiff's claim that the carrying of the cooler had no direct bearing on police training, the fact remains that defendants deemed this task part of the program and it is not our place to supplant the Academy's methods with some other view as to the proper method of training law enforcement officers. The only plausible interpretation of the exculpatory agreement requires a finding that the agreement encompassed all those tasks designated by defendants as part of police training; that requires our holding that the occurrence in question constituted part of plaintiff's training and is barred by the terms of the exculpatory agreement.[14]
Affirmed.
NOTES
[1] Judge Miniman did not participate in oral argument but was added to the panel with the parties' consent.
[2] In other words, we assume without deciding that defendants do not have tort claim immunity and that they were negligent with regard to the occurrence in question.
[3] The Court held that public policy precluded the enforcement of an exculpatory agreement executed by a parent on behalf of a minor so that the minor could enter a skateboard facility. Hojnowski, supra, 187 N.J. at 338, 901 A.2d 381. As Justice LaVecchia observed in her dissent, which was joined by Justice Rivera-Soto, the majority did not hold that such an agreement, if executed by an adult on the adult's behalf, would be unenforceable; the dissenting justices concluded that an agreement waiving an adult's claim for damages in that setting would be enforceable. Id. at 347-48, 901 A.2d 381.
[4] This case does not involve a public utility or common carrier, so we need not examine that ground for rejecting an exculpatory agreement.
[5] We acknowledge that the Police Training Act also does not expressly permit such agreements. It is utterly silent on the subject; we assume this is the reason that neither party has referred to the Police Training Act in their written submissions.
[6] The record does not reveal whether defendants carry liability insurance to cover such occurrences. And assuming insurance is in place, the record does not reflect the additional cost in insurance premiums that would accrue if the exculpatory agreement is not enforced.
[7] Exceptions have been created with regard to recreational exculpatory agreements, but only as to the scope of persons to which the agreements will be deemed to apply. In Hojnowski, supra, 187 N.J. at 338, 901 A.2d 381, the Court held that a parent's execution of an exculpatory agreement could not bar the minor's personal injury claim. And, in Gershon, supra, 368 N.J.Super. at 247, 845 A.2d 720, we held that an individual's execution of an exculpatory agreement in favor of a scuba diving instructor could not bar an heir's wrongful death action.
[8] There are few decisions dealing with exculpatory agreements in the same or similar settings; these decisions have produced mixed results. In Radloff v. Village of West Dundee, 140 Ill.App.3d 338, 95 Ill.Dec. 135, 489 N.E.2d 356, 357-58 (1986), the court upheld an exculpatory agreement that barred a police trainee's claim for personal injuries by rejecting the plaintiff's argument that such agreements "would have a chilling effect on the number and quality of applicants testing for the police department." Later, a different panel of the same court refused to enforce a similar exculpatory agreement executed by an individual seeking to become a firefighter/paramedic, finding a lack of consideration for the agreement, White v. Village of Homewood, 256 Ill.App.3d 354, 195 Ill.Dec. 152, 628 N.E.2d 616 (1993), an argument not asserted here. See also Hinson v. United States, 55 F.Supp.2d 1376, 1381 (S.D.Ga.1998) (finding it unnecessary, in applying Alabama law, to determine the enforceability of an exculpatory agreement executed by a correctional officer seeking to become a boot camp instructor in the prison system; the court did, however, express its doubt about the agreement's validity); Naylor v. Dist. Bd. of Trs., 839 So.2d 915, 916 (Fla.App.) (affirming the enforcement of an exculpatory agreement to bar a personal injury suit brought by a police trainee, but certifying this issue of "great public importance" for further review), review denied, 857 So.2d 196 (Fla.2003) (review denied by a 4-3 decision).
[9] In Brough, the court identified what it believed was "an inconsistency between McCarthy and McBride," but also then correctly identified that the determinative factor is the existence of a statutory duty, which existed in both Brough and McCarthy, but not McBride. 312 N.J.Super. at 155, 711 A.2d 382.
[10] See www.state.nj.us/lps/dcj/njptc/home.htm (last visited April 14, 2009).
[11] In this regard, plaintiff makes much of the fact that he and his expert viewed designation as a "lunch recruit," which obligated him and another recruit to carry a cooler from one location to another, as a form of hazing, having little or nothing to do with training a future police officer.
[12] We would also observe, in considering the fairness of the agreement on its whole, that the contract called for information regarding health insurance coverage. One provision, which we assume was executed by plaintiff's employer, represented that "this recruit is covered by a minimum of $300,000 general liability insurance and medical insurance." We assume from this that the Academy's intention in obtaining the exculpatory agreement was not to put plaintiff in a position where he might be injured without monetary recourse; the contract instead called for the transfer of the risk to plaintiff and his employer, which further demonstrates that the overall contractual undertaking was not unconscionable or contrary to public policy. We lastly observe in this connection that the record does not reveal whether plaintiff pursued any right to recovery he might have under workers' compensation laws. In short, we have no reason to conclude that enforcement of the exculpatory agreement leaves plaintiff with no recourse from any source of compensation for his injuries.
[13] Although we doubt the enforceability of the exculpatory agreement to the extent that an injured trainee might, in a different case, assert a claim based upon reckless or intentional tortious conduct, see, e.g., Hojnowski, supra, 187 N.J. at 333, 901 A.2d 381; Kuzmiak, supra, 33 N.J.Super. at 580, 111 A.2d 425, we need not decide that issue because we are only here considering the agreement's application to a negligence claim.
[14] Plaintiff has not argued that the act of going to or coming from a training session was not part of the program. He has acknowledged  indeed, it forms part of his claim of negligence  that the act of moving up the stairs from the locker room to the gymnasium fell within the scope of the program. Accordingly, although not cited by either party, we do not find a basis for viewing the circumstances of this case like the facts encountered by the court in Hinson, supra. In Hinson, the facts revealed that the plaintiff's training day began at 4:30 a.m. and ended at 5:00 p.m. 55 F.Supp.2d at 1378. One evening, at 9:15 p.m., the plaintiff stepped out on a second floor balcony in his dormitory to smoke a cigarette. Finding himself locked out and unable to get anyone's attention to let him back in, the plaintiff walked down a fire escape, which had a nonfunctioning light; he lost his balance and fell, causing the injuries of which he complained. Id. at 1379. Finding that billeting was not part of the training program, the court concluded that the plaintiff's claim for damages was not barred by the exculpatory agreement he had executed. Id. at 1381-82.