687 A.2d 316

CHEMICAL BANK OF NEW JERSEY NATIONAL ASSOCIATION, PLAINTIFF, v. LEROY BAILEY, VELERIA BAILEY, CITICORP MORTGAGE, INC., UNITED STATES OF AMERICA, DEFENDANTS.

STEWART TITLE GUARANTY COMPANY, DEFENDANT AND THIRD–PARTY PLAINTIFF–APPELLANT, v. JANICE M. NEWMAN, ESQ., AND R.C. SEARCH CO., INC., THIRD–PARTY DEFENDANTS–RESPONDENTS, AND R.C. SEARCH CO., INC., FOURTH–PARTY PLAINTIFF.

JANICE M. NEWMAN, ESQ., FOURTH–PARTY DEFENDANT AND FIFTH–PARTY PLAINTIFF, v. STEWART TITLE GUARANTY COMPANY, FIFTH–PARTY DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued September 10, 1996—Decided January 21, 1997.

Before Judges MICHELS, MUIR, Jr. and KLEINER.

*Richard L. Marcickiewicz* argued the cause for appellant Stewart Title Guaranty Company (*Sears, Sweeney & Marcickiewicz,* attorneys; *Robert A. Maren,* of counsel and on the brief).

*Janice M. Newman,* respondent, argued the cause pro se.

*Evan W. Zwillman* argued the cause for respondent R.C. Search Co., Inc. (*Zwillman & Zwillman,* attorneys; *Zwillman,* of counsel and on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Defendant and third-party plaintiff Stewart Title Guaranty Co. (Stewart Title) appeal from a judgment of the Law Division entered in favor of third-party defendants Janice M. Newman, Esq. (Newman) and R.C. Search Co., Inc. (R.C.) following a bench trial arising out of a foreclosure action in which Stewart Title sought to recover damages, including counsel fees and costs, against Newman on the theory of legal malpractice and against R.C. on the theory of breach of contract.

The factual background and the procedural history giving rise to this complex matter is summarized as follows: On June 22, 1981, Stewart Title and R.C. executed a Title Insurance Underwriting Agreement wherein R.C. became an agent for Stewart Title. Section 5 of the Underwriting Agreement set forth how losses were to be divided between the two companies. Section 5(A) specified that R.C. would be liable to Stewart Title for the first $500 of each loss under a title policy not due to R.C.'s negligence or fraud. Section 5(A) provides:

> On each loss under a title policy issued pursuant to this AGREEMENT not due to [R.C.'s] negligence or fraud, [R.C.] shall be liable to [Stewart Title] for the first *$500.00* of such loss. The term loss shall include the amount paid to or for the benefit of the insured as well as loss adjustment expense including any cost of defending the claim resulting in the loss.

Section 5(B) provided that R.C. was liable to Stewart Title for the entire amount of each loss due to negligence, fraud, or the intentional act or omission of R.C., its employees, representatives, or agents. Section 5(B) provides:

> On each such loss due to the negligence, fraud or intentional act or omission of [R.C.] or it's [sic] employees, representatives or agents, [R.C.] shall be liable to [Stewart Title] for the entire amount of such loss. Negligence, as the term is used herein, includes, but is not limited to the failure of the title plant, failure to discover or report any instrument of record affecting title, violation of escrow instructions and the failure to prepare a title policy in a manner that properly reflects any such instrument contained in the search of title.

Section 5(C) provided that: "On each loss suffered by [Stewart Title] by reason of it's [sic] Indemnity Letter issued pursuant to Clause 2E of this AGREEMENT, [R.C.] shall be liable to [Stewart Title] for the entire amount of such loss." Clause 2(E), in turn, provided: "[Stewart Title] shall furnish it's [sic] usual form of indemnity letter to each of [R.C.]'s customers that request such a letter."

The issues in this appeal arose from a real estate transaction occurring on or about July 9, 1990. Defendant Leroy Bailey and Veleria Bailey (the Baileys) were the fee title owners of real property located at Lot 14, Block 258, otherwise known as 104 Mt. Vernon Avenue (the property), in the Township of Irvington, New Jersey. The Baileys retained the services of Newman, an attorney, to close a loan of $80,000.00 to be made by defendant Citicorp Mortgage, Inc. (Citicorp). The Citicorp loan was to refinance the existing debt secured by the property.

At the time the property was encumbered by two existing mortgages: a purchase money mortgage of Forman Mortgage Co. in the amount of $26,000.00, assigned to Talman Home Mortgage Corporation (Talman) and a second mortgage of plaintiff Chemical Bank of New Jersey, National Association (Chemical), in the amount of $50,000.00. Citicorp required that the mortgage securing its loan be a first lien on the property. The loan commitment issued by Citicorp further required that the Baileys obtain a title insurance policy insuring the Citicorp mortgage as a first lien.

Newman, on behalf of the Baileys, contacted R.C. to obtain the requisite title insurance for the Citicorp mortgage. A commitment for title insurance, effective February 5, 1990, was issued by R.C. The policy to be issued was a loan policy insuring the Citicorp mortgage of $80,000.00 as a first lien. The requirements of the commitment issued by R.C. included the execution, delivery, and recording of all instruments necessary to create the interest to be insured.

Newman received closing instructions from Citicorp's review attorneys. One of the identified conditions to be met prior to closing was the following:

> Any Mortgage referred to in the title binder must be paid or canceled of record and proof of same submitted to this office.

The closing instructions also prohibited any secondary financing. On April 10, 1990, Stewart Title sent a copy of its usual indemnity letter to Citicorp, as a customer of R.C., as required by the Underwriting Agreement.

Newman closed the loan on or about June 28, 1990. A payoff statement was obtained from Talman and a check was sent representing payment in full. No specific payoff statement was obtained from Chemical. Newman had possession of the Baileys' March 12, 1990 billing statement from Chemical and called prior to closing to obtain an updated balance. Newman calculated the per diem interest through closing and forwarded a check to Chemical in the amount of $49,076.80 along with the March 12, 1990 billing statement. No cover letter or other instruction were sent by Newman.

Newman received a mortgage endorsed for cancellation from Talman. Newman did not receive a discharge of mortgage or the original mortgage endorsed for cancellation from Chemical. Newman did not make any effort following the closing to obtain a discharge of the Chemical mortgage or to cancel it of record. R.C., as title agent, received payment from Newman for the title policies to be issued. No policies, however, were issued by R.C.

since Newman did not provide R.C. with the canceled Chemical mortgage.

Citicorp, as the proposed first mortgagee in the title commitment issued by R.C., made efforts to obtain a copy of the title policy. Subsequent communications regarding the title policy, in 1991 through 1993, occurred between Citicorp and Newman and Citicorp and R.C. However, neither Newman nor R.C. provided a title policy to Citicorp, nor was Citicorp advised regarding why the title policy was not issued.

In August and September 1991, withdrawals were made against the Chemical home equity credit line of the Baileys by the son of Veleria Bailey, James Williams (Williams). This credit line was supposed to have been canceled at the closing. Within thirty days, $31,500 was advanced from the $50,000 home equity credit line. During an attempt at a subsequent withdrawal from the credit line, Chemical became suspicious and contacted the local authorities. The Verona Police Department identified Williams, who was in possession of various personal identification documents belonging to Leroy Bailey, as the party seeking to make withdrawals from this credit line. The Verona Police contacted a person who it assumed was Mrs. Bailey to determine whether or not her son had authority to make withdrawals on the $50,000 credit line. The person indicated to the police that her son did have such authority. Yet, during an investigation by Chemical's Fraud Prevention Unit, Mrs. Bailey did not confirm that her son had authority to make the withdrawals.

When no payments were made on these advances, Chemical declared default and instituted a foreclosure action against the Baileys, Citicorp, and defendant United States of America, which had filed a federal tax lien against the Baileys. Citicorp was named in the foreclosure action as a defendant because it was the holder of the mortgage which was recorded subsequent to the Chemical mortgage. Stewart Title, on behalf of and in the name of its insured Citicorp, filed an answer and counterclaimed against Chemical, essentially seeking first lien protection based on a

theory of equitable subrogation. It also crossclaimed against the Baileys and filed a third-party complaint against third-party defendants Newman and R.C. The crossclaim and third-party complaint asserted that, should it be determined that Citicorp did have not a priority lien but a junior lien as alleged by Chemical, the damages sustained by Citicorp were the result of the wrongful conduct of the Baileys, Newman, and R.C.

Newman and R.C. filed answers, crossclaims, counterclaims and fourth- and fifth-party complaints.[1] R.C.'s answer denied negligence and by way of a crossclaim sought contribution and indemnification from Newman and the Baileys. R.C.'s fourth-party complaint against Stewart Title sought indemnification and contribution. The Baileys filed an answer, third-party complaint, and counterclaim denying liability and alleging that Chemical advanced monies to a third party secured by their mortgage without their consent and/or authorization.

In May 1994 Citicorp, through Stewart Title, agreed to purchase the note and mortgage of Chemical and to take an assignment of the mortgage and the foreclosure cause of action for the sum of $17,350. Stewart Title then paid $17,350 necessary to purchase the Chemical note and mortgage. The remaining balance due, as claimed in the foreclosure complaint, was $31,500. Through Stewart Title, Citicorp continued to prosecute the foreclosure action and pursued the Baileys, Newman, and R.C. for the monies advanced to purchase the Chemical note and mortgage.

Thereafter, the trial court granted summary judgment on liability in favor of Citicorp against Newman and the matter was then listed for trial against the remaining defendants. Prior to trial, the Baileys settled the foreclosure action with Stewart Title,

---

[1] This opinion repeats the actual language—"fourth-" and "fifth-party" complaints—used by the parties. However, the parties should have instead only entered crossclaims and counterclaims against the other parties already members to the suit.

giving a deed in lieu of foreclosure to Citicorp. Citicorp then released the Baileys from all claims.

On the scheduled trial date, the terms of the settlement between Citicorp and the Baileys were placed on the record and the trial court declared a mistrial and transferred the remaining claims to the Law Division. In the Law Division, Citicorp was granted leave to amend its claims against R.C. to include claims arising out of the Underwriting Agreement and to substitute Stewart Title as subrogee of Citicorp. In sum, Stewart Title sought to recover the $17,350 that it paid to purchase the Chemical note and mortgage, as well as counsel fees and costs, from Newman based on a claim of legal malpractice and from R.C. based on the Underwriting Agreement. At the conclusion of the proofs, the trial court found that R.C. was not liable to Stewart Title because the liability provisions of the Underwriting Agreement were unenforceable. The trial court also found that Newman was not liable to Stewart Title because the settlement had prejudiced her subrogation rights. Stewart Title appeals.

Stewart Title seeks a reversal of the judgment and the entry of a judgment against Newman and R.C. for the $17,350 it paid to purchase the Chemical note and mortgage as well as counsel fees and costs. It contends that (1) the trial court incorrectly interpreted Section 5(C) of the Underwriting Agreement and incorrectly held that Section 5(c) was not enforceable; (2) Newman is liable to the extent that her legal malpractice was a proximate cause of the loss and damages sustained; (3) the settlement of the foreclosure complaint does not preclude it from pursuing claims against Newman and R.C.; and (4) Newman's legal malpractice in failing to request and obtain a discharge or cancellation of the Chemical mortgage was a proximate cause of the loss and damages it sustained.

## I.

We are satisfied the trial court properly held that Stewart Title impaired Newman's right of subrogation and, therefore,

Newman, although guilty of legal malpractice in closing the Baileys loan, was not liable to Stewart Title for the loss damages incurred in settling the foreclosure matter by purchasing the Chemical note and mortgage and arranging for the Baileys to give a deed in lieu of foreclosure to Citicorp for the latter's release.

" '[S]ubrogation is a device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it [and] ... to serve the interests of essential justice between the parties.' " *Culver v. Insurance Co. of N. Am.,* 115 *N.J.* 451, 455–56, 559 *A.*2d 400 (1989) (omission and second alteration in original) (quoting *Standard Accident Ins. Co. v. Pellecchia,* 15 *N.J.* 162, 171, 104 *A.*2d 288 (1954)). Subrogation is an equitable tool by which the subrogee, having paid the subrogor for a loss, steps into the shoes of the subrogor to assert any claim the subrogor had against a third party who in good conscience ought to pay for the loss. The subrogated claim may be asserted against any third party who bears the ultimate risk of loss, regardless of how such responsibility arose. Nevertheless, it is important to understand that subrogation rights neither arise spontaneously nor float freely or open-endedly. *Id.* at 456, 559 *A.*2d 400. Instead, subrogation rights are created in three ways: (1) by an agreement between an insurer and the insured, (2) by statute, or (3) by a judicial " 'device of equity to compel the ultimate discharge of an obligation by one who in good conscience ought to pay it.' " *Ibid.* (citations omitted).

In addition to subrogation rights, New Jersey permits indemnification for monies paid in settlement of a lawsuit. *Central Motor Parts Corp. v. E.I. duPont deNemours and Co.,* 251 *N.J.Super.* 34, 38, 596 *A.*2d 773 (Law Div.1989), *aff'd in part, rev'd in part,* 251 *N.J.Super.* 5, 596 *A.*2d 759 (App.Div.1991). Yet, while case law allows indemnification for settlement payments, it requires the indemnitee to demonstrate that "(a) the indemnitee's claims are based on a valid, pre-existing indemnitor/indemnitee relationship; (b) the indemnitee faced potential liability for the

claims underlying the settlement; and (c) the settlement amount was reasonable." *Id.* at 39, 596 *A.*2d 773.

Based on these principles, the trial court properly found that (1) Stewart Title had not proven that the alleged damages and loss claimed were attributable to Newman's legal malpractice because Stewart Title had failed to mitigate damages when it purchased the Chemical note and mortgage and settled the case and (2) Stewart Title impaired Newman's subrogation right when it settled the underlying claims against the Baileys without consulting with and obtaining the approval of Newman.

As a party who must indemnify Stewart Title for losses naturally flowing from her legal malpractice, Newman would have acquired subrogation rights in Stewart Title's underlying claims if she settled with Stewart Title. As noted, a subrogee has rights against third parties who in good conscience are responsible for the debt paid to the subrogor. The settlements by Stewart Title, as subrogor, concluded the case against the Baileys who Newman, as subrogee, would have had a cause of action against. Stewart Title, however, settled the matter without consulting Newman and thus impaired Newman's right of subrogation. Stewart Title purchased Chemical's note and mortgage on the Baileys property for $17,350 and took an assignment of the foreclosure action against the Baileys. The note and mortgage were assigned to Citicorp and Stewart Title continued to prosecute the foreclosure action. In order to settle the foreclosure action, Stewart accepted from the Baileys a deed in lieu of foreclosure, which was also assigned to Citicorp. By accepting this deed to resolve these interrelated transactions, Stewart Title satisfied all claims arising out of the foreclosure action through an accord and satisfaction. In *Theobald v. Kenney's Suburban House, Inc.,* 48 *N.J.* 203, 206–07, 225 *A.*2d 10 (1966), our Supreme Court explained:

> Joint tortfeasors being severally as well as jointly liable, the injured party may pursue them in separate actions, see *Kennedy v. Camp,* 14 *N.J.* 390, 395 [102 *A.*2d 595] (1954). . . . But it is generally agreed that if claimant receives satisfaction of a judgment against one, his rights against all are thereby concluded. *Restatement of Judgments,* § 95 (1942); 4 *Restatement of Torts* § 886 (1939); Prosser, *Torts* § 45,

p. 268 (1964); 1 Harper and James, *Torts* § 10.1, p. 710 (1956); 30A Am.Jur. Judgments § 1007, p. 865; 52 Am.Jur., Torts § 131, p. 467; Annotations, 166 *A.L.R.* 1099 (1947); 65 *A.L.R.* 1087 (1930); 27 *A.L.R.* 805 (1923).

[Footnote omitted.]

The accord and satisfaction achieved by the settlement is especially important because it eliminated the necessity of litigating the validity of Chemical's $31,500 claim for the forged checks negotiated on the Baileys' home equity credit line. Were this claim successfully challenged by the Baileys, it could have totally eliminated Chemical's claim under its note and mortgage, and relieved Newman of any liability for her legal malpractice. Consequently, the settlement eliminated Newman's opportunity to prove that her legal malpractice was not a proximate cause of any loss eventually sustained by Stewart Title.

Moreover, the trial court correctly noted that these settlements should have accrued to Newman's benefit to eliminate the consequences of her legal malpractice. The trial court also correctly ruled that no evidence was offered regarding the value of the mortgage and deed which Stewart Title obtained in settlement for Citicorp. Such amounts should have accrued to Newman's benefit. Thus, Stewart Title did not perform the necessary prerequisites to trigger an obligation on Newman's part to indemnify it. Stewart Title also offered no proof to establish that the settlements were objectively reasonable. Stewart Title's reliance on *Tessmar v. Grosner*, 23 *N.J.* 193, 128 *A.*2d 467 (1957), to support its argument that the reasonableness of settlement need not be established with certainty is misplaced. In sum, the judgment in favor of Newman on the claim asserted by Stewart Title is affirmed substantially for the reasons expressed by Judge Kirsten in his letter opinion of August 4, 1995.

## II.

However, we are satisfied that the trial court erred in entering judgment in favor of R.C. on Stewart Title's claim under the Underwriting Agreement. It is fundamental that parties to a contract may allocate risk of loss by agreeing to limit their liability

as long as the limitation does not violate public policy. *Moreira Constr. Co. v. Moretrench Corp.*, 97 *N.J.Super.* 391, 394, 235 *A.2d* 211 (App.Div.1967), *aff'd o.b.*, 51 *N.J.* 405, 241 *A.2d* 236 (1968); 5 *Williston on Contracts* § 781A at 709–10 (Jaeger ed., 3d ed.1961). Clauses in private contracts that limit liability are also generally sustained so long as they do not adversely impact the public interest. *Mayfair Fabrics v. Henley*, 48 *N.J.* 483, 487, 226 *A.2d* 602 (1967).

█ Courts, however, will not enforce an exculpatory clause if the party benefiting from exculpation is subject to a positive duty imposed by law or is imbued with a public trust, or if exculpation of the party would adversely affect the public interest. *McCarthy v. National Ass'n for Stock Car Auto Racing, Inc.*, 48 *N.J.* 539, 543, 226 *A.2d* 713 (1967); *Hy–Grade Oil Co. v. New Jersey Bank*, 138 *N.J.Super.* 112, 116, 350 *A.2d* 279 (App.Div.1975), *certif. denied*, 70 *N.J.* 518, 361 *A.2d* 532 (1976); *Mayfair Fabrics v. Henley, supra*, 48 *N.J.* at 487, 226 *A.2d* 602; *Kuzmiak v. Brookchester, Inc.*, 33 *N.J.Super.* 575, 580, 111 *A.2d* 425 (App.Div.1955). Exculpatory clauses are more commonly upheld in the commercial context. *See Hy–Grade Oil Co. v. New Jersey Bank, supra*, 138 *N.J.Super.* at 116, 350 *A.2d* 279.

█ In a commercial setting, "[t]he judiciary will not undertake the writing of a different or better contract between the parties." *Swisscraft Novelty Co. v. Alad Realty Corp.*, 113 *N.J.Super.* 416, 421, 274 *A.2d* 59 (App.Div.1971). *See also Marini v. Ireland*, 56 *N.J.* 130, 143, 265 *A.2d* 526 (1970); *Kampf v. Franklin Life Ins. Co.*, 33 *N.J.* 36, 43, 161 *A.2d* 717 (1960); *Washington Constr. Co., Inc. v. Spinella*, 8 *N.J.* 212, 217, 84 *A.2d* 617 (1951). Where the interpretation of exculpatory clauses are involved,

[t]he central question is not whether the parties agreed to insure against loss the risks they severally assumed *inter sese* but, rather, whether they so clearly allocated the risks that each party knew, or should have known, the existence of its contingent liability and was thus placed in a position where it could protect itself against such loss by adequate insurance coverage or otherwise.

[*Swisscraft Novelty Co. v. Alad Realty Corp., supra,* 113 *N.J.Super.* at 422, 274 *A.*2d 59.]

"The scope and application of an exculpatory clause depends on the particular circumstances [of a case]." *Tannock v. New Jersey Bell Telephone Co.,* 212 *N.J.Super.* 506, 512, 515 *A.*2d 814 (Law Div.1986), *aff'd in part, rev'd in part,* 223 *N.J.Super.* 1, 537 *A.*2d 1307 (App.Div.1988). The *Tannock* court offered the following analysis:

> In a given case, factors such as unconscionability and other contract defenses may bear on the enforceability of the exculpatory agreement. *Broadway Maintenance Corp. v. Rutgers,* 90 *N.J.* 253 [447 *A.*2d 906] (1982) (exculpatory clause upheld in construction contract where it did not violate public policy). However, it is well settled that such provisions are to be construed strictly against the party relying on the clause. *Carbone v. Cortlandt Realty Corp.,* 58 *N.J.* 366 [277 *A.*2d 542] (1971) (an exculpatory clause in a commercial lease should not be construed to exculpate a landlord unless the clause expressly so states or the intent to do so is evident from the arrangement of the parties); *Kuzmiak v. Brookchester,* 33 *N.J.Super.* 575 [111 *A.*2d 425] (App.Div.1955) (exculpatory clause in a residential lease that attempted to immunize landlord from liability for an wrongdoing held invalid).

> [*Id.* at 512, 515 *A.*2d 814.]

Though offered as a two-pronged test for unconscionability, the *Tannock* court analyzed the relative bargaining power of the parties and the alleged unreasonability of the provision to determine when an exculpatory clause should not be enforced. *Id.* at 513, 515 *A.*2d 814.

In this case, Stewart Title has sought to exculpate itself from liability for the costs of putting Citicorp in first lien position through Section 5(C) in the Underwriting Agreement. The trial court, however, reasoned that "the extent of the liability under the indemnity letter is not based upon the letter but based upon the interpretation of … the agreement." Thus, it would not enforce Stewart Title's attempt to exculpate itself from paying to put Citicorp in first lien position by the "circuitous" route of Section 5C since it was "inequitable." This interpretation, however, rendered Section 5C meaningless and left R.C. liable only for its negligent, fraudulent, or intentional wrongdoing under Section 5B.

There is no support in the record for this interpretation. Even though Stewart Title drafted the Underwriting Agreement, there is no evidence or even suggestion that R.C. was the victim of an inequitable bargaining situation or that the Underwriting Agreement violated public policy. During the testimony of the R.C.'s president, Richard Cecere, no mention was made of significant economic disparities between R.C. and Stewart Title. To the contrary, the Underwriting Agreement is a private contract between business entities. Both parties are sophisticated and deal regularly with contract liability.

Furthermore, the language of Section 5 is clear and unambiguous and establishes the division of loss and expenses between the parties. When Stewart Title must pay a claim under Section 5(C) because of the conditions contained in the indemnity letter, such as its claim on behalf of Citicorp, R.C. became liable to Stewart Title for the "entire amount of such loss." The trial court's interpretation to the contrary rendered Section 5(c) completely meaningless. The judgment in favor of R.C., therefore, must be reversed and judgment of liability entered in favor of Stewart Title against R.C. In addition, the matter is remanded to the trial court to determine damages. In this regard, Stewart Title argues that it is entitled to recover the cost of its defense of Citicorp, including the $17,350 paid to Chemical Bank and counsel fees. The payment of the $17,350 led to the deed in lieu of foreclosure from the Baileys. The record does not disclose the amount realized from the sale of the property or, alternatively, the fair market value of the property. These factors may have relevance to Stewart Title's damage claim and should be considered by the trial court in determining damages.

### III.

Accordingly, the judgment in favor of Newman is affirmed, the judgment in favor of R.C. is reversed, and judgment of liability is entered in favor of Stewart Title against R.C. The matter is

remanded to the trial court to determine damages, counsel fees, and costs.  We do not retain jurisdiction.