975 A.2d 494 (2009)
408 N.J. Super. 435
Gina STELLUTI, Plaintiff-Appellant,
v.
CASAPENN ENTERPRISES, LLC, d/b/a Powerhouse Gym, Defendant-Respondent, and
ABI Property Partnership, d/b/a Pavilion Center and Star Trac Fitness, Defendants.
No. A-3780-07T2.
Superior Court of New Jersey, Appellate Division.
Argued January 26, 2009.
Decided July 29, 2009.
*496 Edward A. Genz argued the cause for appellant (Montenegro, Thompson, Montenegro & Genz, P.C., Brick Town, attorneys; Mr. Genz, on the brief).
Russell S. Massey argued the cause for respondent (Billet & Associates, LLC, attorneys; Robert Douglas Billet, Philadelphia, PA, on the brief).
Before Judges CARCHMAN, COLEMAN and SABATINO.
The opinion of the court was delivered by
SABATINO, J.A.D.
We consider in this appeal the scope and enforceability of exculpatory provisions in a form contract of a fitness club. In that non-negotiable agreement, the club disclaimed liability for "all injuries which may occur" as a result of, among other things, its member's "use of all amenities and equipment," his or her "participation in any activity," "the sudden and unforeseen malfunctioning of any equipment," and the club's "instruction, training [or] supervision."
Plaintiff, who signed the exculpatory agreement when she joined the club, was injured on its premises less than an hour later. Her injury occurred when the handlebars abruptly became detached from a stationary bicycle that she was riding in a group spinning class. She sued the club and other parties for personal injuries, alleging in her complaint that the club had failed to maintain the bicycle properly, provide adequate warnings and instruction on the safe use of the bicycle, or adequately train and supervise its employees. The Law Division granted summary judgment, finding the club absolved from liability under the exculpatory agreement.
We hold, both as a matter of contract interpretation and as a matter of public policy, that the exculpatory agreement only insulated the club from ordinary negligence respecting the use of the exercise equipment at its facility. The agreement did not, and could not, shield the club from more extreme conduct such as reckless, willful or wanton, or palpably unreasonable acts or omissions diminishing the safe condition of its equipment. However, because there is no genuine issue of material fact that such extreme acts or omissions caused plaintiff's accident, we affirm the summary judgment order.

*497 I.
We summarize the underlying facts in a light most favorable to plaintiff. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995); R. 4:46-1.
On the morning of January 13, 2004, plaintiff Gina Stelluti joined a fitness club known as the "Powerhouse Gym" in Brick Township. The Powerhouse Gym is a trade name of defendant Casapenn Enterprises, LLC.[1] One of the exercise rooms at Powerhouse is equipped with numerous stationary bicycles. The bicycles are regularly used in what are commonly known as "spinning classes," in which a fitness instructor in front of the room leads participants in a simulated ride. The instructor periodically issues verbal commands to the riders to change their position on the bike or to adjust the tension on the spinning wheel.
Plaintiff arrived at the club at approximately 8:30 a.m. After enrolling as a member of the club for a monthly fee of $149.00 and signing the necessary paperwork, she entered an exercise room with stationary bicycles for an 8:45 a.m. spinning class. According to plaintiff's certification, she had never attended a class like this before, and she informed the spinning instructor of her inexperience. The instructor strapped plaintiff's feet into the bike and adjusted the seat. The instructor then advised plaintiff to watch her during the class.
The bike on which plaintiff was seated was a "Star Trac Johnny G. Spinner Pro" model, manufactured by Unisen, Inc.-Star Trac ("Star Trac"). The bike has a saddle that is adjustable both horizontally and vertically, and handlebars that are only adjustable in a vertical direction.
As described in the report of Powerhouse's liability expert, Robert J. Phillips, P.E., the detachable handlebars have a chrome stem post approximately seven inches long. The post contains seven elevation positioning holes, spaced about three-quarters of an inch apart. The post fits into a vertical support on the bike frame. The post attaches to the support with a spring-loaded, threaded locking pin, which is to be inserted into one of the seven elevation holes and then secured by tightening a "T" shaped handle.
Plaintiff's own liability expert, John Burgess, a college professor in physical education, explained in his report that
The handlebars [of the bike] are designed to be moved up or down in set positions using a threaded pop-pin or snap-pin which will automatically settle in the next hole in the handlebar stem since this is a spring loaded device. This positions the handlebar stem.
With respect to the instructor's role in assisting a novice rider's setup on the bike, Professor Burgess added:
Once a comfortable position for the rider is determined, with the help of the instructor for a first time Spinning participant such as the plaintiff Ms. Stelluti, the threaded handle of the pop-pin is turned clockwise to fully secure the handlebars in the desired height for the rider.
As the spinning class began, plaintiff started pedaling in a seated position. Shortly thereafter, the instructor apparently told the class to assume a standing position. Then, as plaintiff described it in her certification:
the handle bars to the spin bike came off the bike while I was spinning on the bike. I fell forward and onto the floor of the gym while my feet were still strapped into the pedals of the bike. I *498 removed myself from the bike with the assistance from someone. I sat out 15 minutes and attempted to resume the class but I was in too much pain and I left the gym.
At her deposition,[2] plaintiff elaborated that she did not feel that the handlebars were loose until she stood up from her saddle. She denied ever pulling up on the handlebars, contending that they "just came out" when she rose.
The exact process by which the handlebars became detached plaintiff's bike frame is not altogether clear. Plaintiff's liability expert Burgess opined that "the proximal [sic] cause [of the accident] was predicated by the handlebars and attached stem becoming dislodged from their normal locked position in a sleeve." He noted that "[a]s Ms. Stelluti stood up out of the saddle[,] leaning forward and putting pressure on the handlebars, the handlebar/stem assembly dislodged forward[,] causing Ms. Stelluti's fall off the bike."
Powerhouse's engineering expert Phillips, whose report supported its products liability cross-claim against the bike manufacturer, offered a more specific theory of causation. Phillips suggested that the handlebar's stem post might have been only resting on the locking pin, rather than the pin being secured into one of the seven adjustment holes on the post. In simulating that condition, Phillips observed that "there was no noticeable difference in the appearance of the locking pin as to whether or not it was engaged in an adjustment hole." Although the lower end of the stem was marked with the word "maximum," signifying the maximum allowable extension of the stem, Phillips opined that "an inexperienced user of the exercise bicycle[] would not notice this mark." This lack of conspicuity, according to Phillips, made the bike "inherently unsafe and dangerous."
Plaintiff suffered injuries to her neck and lower back in the spinning accident, and also had a tooth jarred loose. She underwent physical therapy and had injections to attempt to abate her pain. She reported persisting pain, numbness and tingling, even three years after her fall. Her medical expert, Robert F. Closkey, M.D., determined that as a consequence of the accident, plaintiff had sustained "permanent chronic pain affecting both her upper and lower extremities as well as her neck, more so on the left side than the right side."
Plaintiff filed a complaint in the Law Division against Powerhouse and Star Trac, the manufacturer. Plaintiff also sued ABI Property Partnership, d/b/a Pavilion Center ("ABI"), the premises owner.[3] Plaintiff claimed that defendants, through their agents, servants and/or employees, were negligent in various ways, in that they:
 "failed to properly maintain and set up the stationary bike used by the plaintiff";
 "failed to properly instruct the plaintiff as to how to use the bike";
 "did not exercise proper care";
 "caused a dangerous and hazardous condition to exist";
 "allowed a nuisance to exist";
 "failed to provide proper safeguards or warnings on the bike";

*499  "failed to provide proper and safe equipment for the plaintiff"; and
 "were otherwise negligent with respect to the aforesaid stationary bike and the use of same."
Apart from these various allegations of negligence, plaintiff also claimed that defendants acted in a "reckless manner" in causing an unsafe condition and failing to provide proper safeguards and warnings. Plaintiff further claimed that defendants failed to adequately train and supervise their employees who had "placed and set up the plaintiff on the bike."
As to defendant Star Trac, plaintiff asserted common-law and statutory claims of products liability, alleging that the bike had a faulty design, was improperly manufactured, and had insufficient safety warnings. She also claimed that Star Trac breached the implied warranty of merchantability under the Uniform Commercial Code.
Powerhouse moved for summary judgment, arguing that plaintiff's claims against the fitness club were barred under the exculpatory agreement that she had signed the morning of her bike accident. The exculpatory agreement provides, in its entirety, as follows:
POWERHOUSE FITNESS (The Club) WAIVER & RELEASE FORM
Because physical exercise can be strenuous and subject to risk of serious injury, the club urges you to obtain a physical examination from a doctor before using any exercise equipment or participating in any exercise activity. You (each member, guest, and all participating family members) agree that if you engage in any physical exercise or activity, or use any club amenity on the premises or off premises including any sponsored club event, you do so entirely at your own risk. Any recommendation for changes in diet including the use of food supplements, weight reduction and or body building enhancement products are entirely your responsibility and you should consult a physician prior to undergoing any dietary or food supplement changes. You agree that you are voluntarily participating in these activities and use of these facilities and premises and assume all risks of injury, illness, or death. We are also not responsible for any loss of your personal property.
This waiver and release of liability includes, without limitation, all injuries which may occur as a result of, (a) your use of all amenities and equipment in the facility and your participation in any activity, class, program, personal training or instruction, (b) the sudden and unforeseen malfunctioning of any equipment, (c) our instruction, training, supervision, or dietary recommendations, and (d) your slipping and/or falling while in the club, or on the club premises, including adjacent sidewalks and parking areas.
You acknowledge that you have carefully read this "waiver and release" and fully understand that it is a release of liability. You expressly agree to release and discharge the health club, and all affiliates, employees, agents, representatives, successors, or assigns, from any and all claims or causes of action and you agree to voluntarily give up or waive any right that you may otherwise have to bring a legal action against the club for personal injury or property damage.
To the extent that statute or case law does not prohibit releases for negligence, this release is also for negligence on the part of the Club, its agent, and employees.
If any portion of this release from liability shall be deemed by a Court of competent jurisdiction to be invalid, then the *500 remainder of this release from liability shall remain in full force and effect and the offending provision or provisions severed here from.
By signing this release, I acknowledge that I understand its content and that this release cannot be modified orally.
Signed: /s/ Gina Stelluti Names of family members(if applicable):
 Printed
 Name: ___________________________
 _________________________________
 Dated: 1/13/04
 [Boldface in original.]
Powerhouse argued that, by entering into this agreement, plaintiff waived any right to sue it or its agents for personal injuries arising out of her accident on the spinning bike. Plaintiff disagreed. In her certification opposing summary judgment, she maintained that she "did not really read" the exculpatory agreement before she signed it. She insisted that "the person giving me the papers to fill out and sign on January 13, 2004 most certainly did not verbally tell me that I was signing a release form." At her deposition, plaintiff similarly asserted that "[t]hey gave me a bunch of papers, and I signed them," denying that she understood at the time what they signified.
Following two sessions of oral argument, the motion judge granted summary judgment to Powerhouse. In his oral decision, the judge found that the exculpatory agreement was unambiguous and enforceable, regardless of whether defendant's conduct is characterized as negligence or as gross negligence. The judge declined plaintiff's overture to declare the agreement in violation of public policy, noting in his analysis that there is no "statutory or regulatory duty imposed upon [the club]." The judge also found inconsequential plaintiff's claim that she did not read or understand the agreement when it was presented to her for signature as her membership was processed.
After summary judgment was granted to Powerhouse, plaintiff moved for leave to appeal, which this court denied. Plaintiff then resolved her remaining claims in the lawsuit against the bike manufacturer, thereby creating finality as to the judgment in favor of Powerhouse.
Plaintiff now appeals. The thrust of her argument is that the exculpatory agreement is adhesive, against public policy, and unenforceable. As part of her argument, she contends that Powerhouse's acts and omissionsin allowing her to use dangerous equipment on its premisesrises beyond ordinary negligence and should be regarded as gross negligence, or some other more severe form of conduct. In response, Powerhouse maintains that the motion judge correctly granted it summary judgment, and that no legal or policy considerations nullify the clear terms of the exculpatory agreement.

II.
We begin our analysis by recognizing certain well-settled principles of tort law.
If, for a moment, we ignore Powerhouse's exculpatory agreement, there is no question that the fitness club would owe duties of care to invitees such as plaintiff who come onto its business premises. In general, "[b]usiness owners owe to invitees a duty of reasonable or due care to provide a safe environment for doing that which is in the scope of the invitation." Nisivoccia v. Glass Gardens, Inc., 175 N.J. 559, 563, 818 A.2d 314 (2003). This duty of care flows from the notion that "business owners `are in the best position to control the risk of harm.'" Hojnowski v. Vans State Park, 187 N.J. 323, 335, 901 A.2d 381 (2006) (quoting Kuzmicz v. Ivy Hill Park *501 Apts., Inc., 147 N.J. 510, 517, 688 A.2d 1018 (1997) (citations omitted)); see also Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 447, 625 A.2d 1110 (1993).
In Hojnowski, supra, 187 N.J. at 329, 901 A.2d 381, our Supreme Court considered whether the operators of a recreational skate park could be liable to a minor who had fractured his femur while using a skateboard ramp within the park. The primary legal issue before the Court was whether a form exculpatory agreement signed by the minor's parents could be enforced to bar the minor's claims. Id. at 333-41, 901 A.2d 381. As part of its analysis, the Court underscored the long-standing principles of premises liability that impose duties of care upon the operators of private recreational facilities. Id. at 335-37, 901 A.2d 381.
As the Court noted in Hojnowski, "[t]he operator of a commercial recreational enterprise can inspect the premises for unsafe conditions, train his or her employees with regard to the facility's proper operation, and regulate the types of activities permitted to occur." Id. at 335, 901 A.2d 381. The same holds true in the present case. Powerhouse and its employees were clearly in a superior position to assure that the exercise equipment on site was provided to its members and their guests in a reasonably safe condition.
The legal duty of a fitness or health club to provide a safe environment for its members and guests has been widely adopted in other jurisdictions. "It has been uniformly recognized that, as with any business establishment, the proprietor of a health club or ... similar facility offering physical fitness equipment and services to its members and the general public owes its invitees a duty of reasonable care to inspect the premises in order to discover dangerous conditions therein[.]" Thomas J. Fleming, Annotation, Liability of Proprietor of Private Gymnasium, Reducing Salon, or Similar Health Club for Injury to Patron, 79 A.L.R. 4th 127, § 2[a] (1990).
Courts also widely recognize a fitness club's duty "to correct such conditions or warn invitees of the danger." Ibid. See, e.g., Patton v. Spa Lady, Inc., 772 P.2d 1082 (Alaska 1989) (holding a fitness center liable to a patron who received an electrical shock while on the premises); Zipusch v. LA Workout, Inc., 155 Cal. App. 4th 1281, 66 Cal.Rptr.3d 704 (2007) (reversing summary judgment granted to a health club in an action for personal injuries sustained by a patron when her foot caught on a sticky substance on a treadmill); Leon v. Family Fitness Center, 61 Cal.App.4th 1227, 71 Cal.Rptr.2d 923 (1998) (finding a health club potentially liable to a patron for injuries caused by the collapse of a sauna bench); Lubell v. Roman Spa, Inc., 362 So.2d 922 (Fla.1978) (upholding health spa's liability for ceiling that collapsed on patron); Corrigan v. Musclemakers, Inc., 258 A.D.2d 861, 686 N.Y.S.2d 143 (finding a triable jury question as to whether a health club was liable for injury to a patron injured on its treadmill); Bertrand v. Palm Springs & European Health Spa, 257 Or. 532, 480 P.2d 424 (1970) (sustaining verdict for a plaintiff who had slipped on hazardous tile in a spa's locker room); see also 80 Am.Jur. Trials 405 § 10 (2003) ("Fitness clubs have a duty to keep the premises and equipment contained there in repair and in a safe condition for the use of their members and the other guests.").
Accepting, therefore, the underlying proposition that Powerhouse owed a duty of care to patrons such as plaintiff under well-settled tort law, the pivotal question then becomes whether the exculpatory agreement eliminates that duty. We approach that question by first taking a closer *502 look at the context and contents of the agreement itself.
We note that the exculpatory agreement is on a pre-printed form prepared by, or on behalf of, Powerhouse. The agreement is one of several documents executed by a new member or guest of the club. The agreement covers two full pages, and is labeled as a "Waiver & Release Form" in a larger font at the top of its first page. As we have already shown, only three phrases in the form appear in bold face type. There are no places designated for a patron to initial any particular sections of the form, apart from the signature line on the bottom of the second page. Plaintiff admits that her signature on the form is authentic.
As Powerhouse's counsel candidly acknowledged to us at oral argument, the exculpatory agreement is, as a practical matter, a non-negotiable document. Patrons who decline to sign the form would not be permitted to use the facility. The form is drafted exclusively by or for Powerhouse, and its provisions are standard in nature. As such, the exculpatory agreement is manifestly a contract of adhesion.
"[T]he essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the `adhering' party to negotiate except perhaps on a few particulars." Rudbart v. North Jersey District Water Supply Commission, 127 N.J. 344, 353, 605 A.2d 681 (1992) (citing Rakoff, Contracts of Adhesion: An Essay in Reconstruction, 96 Harv. L.Rev. 1174, 1176 (1983); 3 Corbin on Contracts § 559C (Supp. 1991)). More succinctly, a contract of adhesion is an instrument that one party "must accept or reject... as is." Rudbart, supra, 127 N.J. at 353, 605 A.2d 681 (citing Vasquez v. Glassboro Serv. Ass'n, 83 N.J. 86, 104, 415 A.2d 1156 (1980)).
Not all contracts of adhesion are unenforceable. For example, in Rudbart, the Court determined that project notes issued by the defendant bank were, under the literal definition, contracts of adhesion, but the notes were nonetheless binding because they did not violate public policy and they were not entered into through unconscionable means. Rudbart, supra, 127 N.J. at 356-61, 605 A.2d 681. Here, we are not persuaded that, as a procedural matter, Powerhouse and plaintiff entered into the exculpatory agreement through "unconscionable means."
The Supreme Court in Rudbart outlined four factors that courts typically consider when determining whether an adhesion contract is unconscionable. "[C]ourt[s] have looked not only to the take-it-or-leave-it nature or the standardized form of the document but also to (1) the subject matter of the contract[;] (2) the parties' relative bargaining positions[;] (3) the degree of economic compulsion motivating the `adhering' party[;] and (4) the public interests affected by the contract." Rudbart, supra, 127 N.J. at 356, 605 A.2d 681. As part of that assessment, a court considers not only the "substantive" contents of the agreement, but also the "procedural" context that led to its execution. Delta Funding Corp. v. Harris, 189 N.J. 28, 40, 912 A.2d 104 (2006).
For example, in Muhammad v. County Bank of Rehoboth Beach, 189 N.J. 1, 22, 912 A.2d 88 (2006), the Supreme Court held that a form contract for a consumer loan which forbade class-wide arbitration was unconscionable and unenforceable. Among other things, the Court noted that the contract was one of adhesion; that there was gross disparity in bargaining power between the consumer and the financial entity; and that the consumer was economically compelled to acquiesce to the *503 loan because of her financial position, factors that were all procedural in nature. Id. at 19-24, 912 A.2d 88. Substantively, the Court also found that the contractual terms adversely affected the public interest. Id. at 18-19, 912 A.2d 88.
By comparison, in Marcinczyk v. State of New Jersey Police Training Comm'n, 406 N.J.Super. 608, 626, 968 A.2d 1205 (App.Div.2009), we recently held that an exculpatory agreement relieving the Police Training Commission of liability for injuries suffered by a trainee was valid and enforceable, because it served a valid public concern, did not negate a statutory duty, and was not unconscionable. Marcinczyk, supra, 406 N.J.Super. at 613, 968 A.2d 1205. Although unequal bargaining power existed between the contracting parties, we found that there was no economic compulsion, a trainee would suffer no loss by walking away from the program, and the contract fairly emphasized the rigors of the police training. Id. at 627, 968 A.2d 1205.
Here, we have some reservations about the procedural context of plaintiff's execution of the exculpatory agreement. In particular, we have concerns about the alleged failure of any Powerhouse staff member to provide an oral explanation of the agreement to plaintiff when it was presented to her for signature, the dearth of any specific illustrations within the document that might have helped plaintiff understand its intended breadth, and the absence of any specific places to initial on the form that might draw the reader's attention.
Even so, we reject plaintiff's contention that the formation of the agreement was procedurally, unconscionable. We do not regard this as a scenario of manifestly unequal bargaining power. Plaintiff could have walked away and taken her membership business to a rival fitness center, perhaps one that did not require an onerous exculpatory waiver. She also could have found other venues to exercise, such as working out at home or outdoors. She could have gone to a public park or recreation facility in lieu of a private gym. The club apparently did not put plaintiff under time pressure to review or sign the agreement. Nothing indicates that she was prevented from leaving the premises and thinking over whether or not to join, or taking the unsigned waiver form to a legal adviser.
We turn to the specific text of the agreement. Its first paragraph largely focuses on considerations of personal health, and the risks of physical injury or medical problems inherent in any exercise or strenuous activity:

Because physical exercise can be strenuous and subject to risk of serious injury, the club urges you to obtain a physical examination from a doctor before using any exercise equipment or participating in any exercise activity. You (each member, guest, and all participating family members) agree that if you engage in any physical exercise or activity or use any club amenity on the premises or off premises including any sponsored club event you do so entirely at your own risk. Any recommendation for changes in diet including the use of food supplements, weight reduction and or body building enhancement products are entirely your responsibility and you should consult a physician prior to undergoing any dietary or food supplement changes. You agree that you are voluntarily participating in these activities and use of these facilities and premises and assume all risks of injury, illness, or death. We are also not responsible for any loss of your personal property.

*504 [(Emphasis underscored added; boldface in original).]
Replete as it is with references to the patron's baseline health and diet, this paragraph evokes the sorts of injuries that a person might foreseeably sustain in any form of strenuous exercisesuch as a muscle pulled on a weight-lifting machine, an ankle sprained while running on a racquet court, or chest pains felt while exerting oneself on a stair-climbing machine.
In fact, plaintiff separately filled out a standard "Health/Safety Consent" form with her membership application, in which she denied having any significant medical problems. The items covered on the health and safety form (heart or lung problems, high blood pressure, recent surgery, physician's restrictions, pregnancy) are conventional areas of medical inquiry. Additionally, an italicized provision (albeit in fine print) at the bottom of the club's one-page Membership Agreement states:
NOTICE: POWERHOUSE FITNESS urges all members to obtain a physical examination from their physicians prior to the use of any exercise equipment or attendance in any exercise class. In recognition of the possible dangers associated with any physical activity, member(s) hereby-knowingly assume the risk of injury and knowingly and voluntarily waives and releases Powerhouse Fitness Center, it's [sic] officers, agents, employers or instructors from any and all causes of action of any kind whatsoever arising as the result of such activity.
[ (Emphasis added).]
As set forth in the Health/Safety Consent form and the Membership Agreement, these related provisions dovetail with the health-related concerns expressed in the first paragraph of the exculpatory agreement. On the whole, the provisions emphasize to a prospective patron that the club is not a guarantor of the patron's medical fitness to use the facility, and urge that the patron consult his or her physician about any restrictions that should be observed.
The next paragraph of the exculpatory agreement, however, goes beyond considerations of health and physical fitness. It specifically extends the club's disclaimer of liability to things such as the safety of the equipment on site, the training and instruction provided by club staff, and the safety of the premises, including even "adjacent sidewalks and parking areas":
This waiver and release or liability includes, without limitation, all injuries, which may occur as a result of, (a) your use of all amenities and equipment in the facility and your participation in any activity, class, program, personal training or instruction, (b) the sudden and unforeseen malfunctioning of any equipment, (c) our instruction, training, supervision, or dietary recommendations, and (d) your slipping and/or falling while in the club, or on the club premises, including adjacent sidewalks and parking areas.
[ (Emphasis added.) ]
With respect to plaintiff's mishap on the spinning bike, Powerhouse chiefly invokes the liability waiver in item (b) of this paragraph, i.e., "the sudden and unforeseen malfunctioning of any equipment." Powerhouse also relies upon item (a) within that same paragraph, insulating it from liability for a patron's "use of all ... equipment in the facility and ... participation in any activity, class, program, personal training or instruction." To the extent that plaintiff contends her accident was caused or compounded by the failure of her spinning instructor, or other club employees, to assure that her handlebars were securely fastened to the bike frame, Powerhouse looks to item (c), covering "instruction, training, [and] supervision."
*505 The agreement concludes with several paragraphs that attempt to maximize and reinforce the patron's waiver of the club's potential liability. These paragraphs include language addressing the judicial enforceability of the agreement, the severability of any invalidated terms, and a merger clause making the agreement orally non-modifiable:
You acknowledge that you have carefully read this "waiver and release" and fully understand that it is a release of liability. You expressly agree to release and discharge the health club, and all affiliates, employees, agents, representatives, successors, or assigns, from any and all claims or causes of action and you agree to voluntarily give up or waive any right that you may otherwise have to bring a legal action against the club for personal injury or property damage.
To the extent that statute or case law does not prohibit releases for negligence, this release is also for negligence on the part of the Club, its agent, and employers.
If any portion of this release from liability shall be deemed by a Court of competent jurisdiction to be invalid, then the remainder of this release from liability shall remain in full force and effect and the offending provision or provisions severed here from.
By signing this release, I acknowledge that I understand its content and that this release cannot be modified orally.
[Boldface in original.]
Literally construed, there is no doubt that the exculpatory agreement, in several respects, covers the substance of plaintiff's bike accident. But more issues arise: (1) is the agreement legally enforceable; and (2) does the agreement cover injuries produced by acts or omissions on the part of defendant which are more severe than ordinary negligence? We now examine those issues.
"The law does not favor exculpatory agreements because they encourage a lack of care." Gershon v. Regency Diving Ctr., Inc., 368 N.J.Super. 237, 247, 845 A.2d 720 (App.Div.2004); see also Hojnowski, supra, 187 N.J. at 333, 901 A.2d 381; Kuzmiak v. Brookchester, Inc., 33 N.J.Super. 575, 580, 111 A.2d 425 (App.Div.1955). "For that reason, courts closely scrutinize liability releases and invalidate them if they violate public policy." Hojnowski, supra, 187 N.J. at 333, 901 A.2d 381. "`[C]ourts have not hesitated to strike limited liability clauses that are unconscionable or in violation of public policy.'" Ibid. (quoting Lucier v. Williams, 366 N.J.Super. 485, 491, 841 A.2d 907 (App.Div.2004)).
Moreover, the terms of adhesive contracts purporting to insulate a party from tort liability are strictly construed. "Any doubts or ambiguities as to the scope of the exculpatory language must be resolved against the drafter of the agreement and in favor of affording legal relief." Gershon, supra, 368 N.J.Super. at 247, 845 A.2d 720 (citing Ultimate Computer Servs., Inc. v. Biltmore Realty Co., Inc., 183 N.J.Super. 144, 443 A.2d 723 (App. Div.), certif. denied, 91 N.J. 184, 450 A.2d 522 (1982)).
In Gershon, supra, 368 N.J.Super. at 248, 845 A.2d 720, we identified four considerations of public policy germane to the issue of enforceability of an exculpatory release. Such a release is enforceable only if: (1) it does not adversely affect the public interest; (2) the exculpated party is not under a legal duty to perform; (3) it does not involve a public utility or common carrier; or (4) the contract does not grow out of unequal bargaining power or is otherwise unconscionable. Ibid.; see also Chemical Bank of New Jersey Nat. Ass'n *506 v. Bailey, 296 N.J.Super. 515, 527, 687 A.2d 316 (App.Div.), certif. denied, 150 N.J. 28, 695 A.2d 671 (1997); Tessler & Son, Inc. v. Sonitrol Sec. Sys. of N. New Jersey, Inc., 203 N.J.Super. 477, 482-83, 497 A.2d 530 (App.Div.1985).
Our courts have applied public policy factors to nullify exculpatory agreements in diverse contexts. For example, in Hojnowski, supra, 187 N.J. at 333-38, 901 A.2d 381, the Supreme Court's most recent case involving an exculpatory agreement, the public policies safeguarding the welfare of children compelled the Court to invalidate a liability release that a child's parents had signed before he went to skateboard in defendant's park. In Gershon, supra, 368 N.J.Super. at 244-51, 845 A.2d 720, we held that the public policies favoring compensation under the Wrongful Death Act nullified an exculpatory clause signed by the decedent scuba diver, which purported to bar his heirs from suing his diving instructors for his wrongful death. We reached a similar conclusion in Lucier, supra, 366 N.J.Super. at 493, 841 A.2d 907, setting aside an exculpatory agreement that tried to cap a home inspector's monetary liability for his professional negligence. See also Cardona v. Eden Realty Co., 118 N.J.Super. 381, 288 A.2d 34 (App.Div.), certif. denied, 60 N.J. 354, 289 A.2d 799 (1972) (finding an exculpatory clause, which attempted to immunize a residential landlord from negligence, contrary to public policy); Kuzmiak, supra, 33 N.J.Super. at 580-88, 111 A.2d 425 (nullifying a similar exculpatory provision in an apartment lease).
Here, Powerhouse is obviously not "public utility or common carrier," the third public policy factor listed in Gershon. Nevertheless, the remaining public policy factors of Gershon are pertinent here.
First, the exculpatory clause, if it is construed to its outermost limits of protection from literally "any and all claims or causes of action," threatens an adverse impact upon the public interest. As we have already noted, business establishments in New Jersey have well-established duties of care to patrons that come upon their premises. An unbounded waiver of liability unjustifiably eviscerates those protections for business invitees. This implicates the second factor of Gershon, the proprietor's "legal duty to perform" the basic duties of care that we have already described. 368 N.J.Super. at 248, 845 A.2d 720.
Moreover, we are mindful that exercise facilities beneficially promote the public health. Physical fitness is an important policy objective, particularly in an era when health care costs are rising and the productivity of a healthy workforce is a major economic concern. On a national level, these interests are exemplified by the President's Council on Physical Fitness, an advisory committee "that encourages all Americans to make being active part of their everyday lives."[4] Likewise, in this state, N.J.S.A. 26:1A-37.6 established the New Jersey Council on Physical Fitness and Sports, whose purpose is "to provide instruments of motivation and education, and [to] promote public awareness to ensure that all citizens of the State have the opportunity to pursue a more healthful lifestyle." Another statutory provision, N.J.S.A. 17B:26-2.1h(8), authorizes insurance benefits for health promotion, such as "annual consultations with health care providers to discuss nutrition *507 and diet recommendations and exercise plans." (Emphasis added).
As society has become more conscious of the importance of physical fitness, "the number of people engaged on a regular basis in such activities as weight lifting, gymnastics and jogging has risen dramatically." Fleming, supra, 79 A.L.R. 4th at § 2[a]. "[P]rivate gymnasiums, reducing salons, health clubs and spas ... have proliferated to meet the demand for facilities and equipment appropriate for a complete fitness program." Ibid. Workouts at private gyms are often part of a prescribed physical therapy regimen. Such endeavors also can be beneficial as a method of preventative care.[5]
The Legislature has recognized that "close to thirty million people now visit health and exercise centers in this country," a statistic that supported the enactment of a statute requiring such facilities in New Jersey to be equipped with automated external defibrillators. N.J.S.A. 2A:62A-30(d). The Legislature has also enacted, in the public interest, consumer-protection laws specifically aimed at assuring that health club patrons are dealt with fairly, regulating concerns such as membership cancellation policies, contract renewals and refunds. See N.J.S.A. 56:8-39 to -48.
We recognize the argument that health clubs need the protection of exculpatory agreements because of the potentially large financial exposures associated with injuries that inevitably will occur on their premises, even in the best-maintained and safest clubs. As Powerhouse's exculpatory agreement rightly points out, "physical exercise can be strenuous and subject to risk of serious injury." People who work out will invariably try to do too much, and suffer the aches, pains, bruises, bumps, shin splints, pulled muscles, and other maladies that come from periodic bursts of exertion. At times, those impacts can be severe, such as a fracture or a cardiac arrest, even fatal. Without insulation from lawsuits seeking compensation for such personal injuries or deaths, the argument goes, health clubs may have to raise their member fees to exorbitant levels, or, even worse, be forced out of the marketplace altogether. If that were true, it could undermine the public policies promoting physical fitness.
On balance, we are not persuaded that the applicable public policy interests justify a complete waiver of liability in a health club's exculpatory clause. In particular, we do not think such a clause can overcome our State's well-established premises liability laws, at least with respect to acts or omissions by the establishment that go beyond ordinary negligence, such as reckless, willful or wanton, or palpably unreasonable behavior.
As the Supreme Court most recently noted in Hojnowski, supra, 187 N.J. at 333, 901 A.2d 381, "[i]t is well settled that to contract in advance to release tort liability resulting from intentional or reckless conduct violates public policy." (Emphasis added) (citing Kuzmiak, supra, 33 N.J.Super. at 580, 111 A.2d 425; Restatement (Second) of Contracts § 195 (1981)). This discrete point was underscored by the dissent in Hojnowski, which observed that the waiver under review did not "exempt defendant from liability for a `future intentional tort or willful act or gross negligence.'" Id. at 347, 901 A.2d 381 (LaVecchia, J., dissenting) (quoting Kuzmiak, supra, 33 N.J.Super. at 580, 111 A.2d 425). *508 Consistent with these longstanding precepts, we will not read Powerhouse's form agreement to immunize it from its own wrongs that rise to a degree of fault beyond ordinary negligence.[6]
In a variety of contexts, case law and statutes have described conduct that is more severe than ordinary negligence, affixing a variety of labels to such behavior. See, e.g., N.J.S.A. 59:4-2(b) (providing that public entities may be liable for dangerous conditions that result from "palpably unreasonable" acts or omissions); Polzo v. County of Essex, 196 N.J. 569, 960 A.2d 375 (2008); Dairy Stores Inc. v. Sentinel Pub. Co., 104 N.J. 125, 516 A.2d 220 (1986) (holding that defamation actions arising out of matters of public concern are not viable unless the defendant acted with knowledge of the statement's falsity, or in "reckless disregard" of the truth); Foldi v. Jeffries, 93 N.J. 533, 461 A.2d 1145 (1983) (abrogating parent-child tort immunity for parental conduct that is willful or wanton). These and other legal authorities segregate harmful conduct that, although not intentional, deserves to be treated differently than garden-variety negligence. If Powerhouse, or any other fitness club, so sharply deviated from the ordinary standards of reasonable care, public policy dictates that the exculpatory agreement should not protect it from liability. We further conclude that it would be substantively unconscionable for a disclaimer to insulate a health club from the harm caused by such egregious behavior.
The very terms of Powerhouse's exculpatory agreement anticipate the prospect that a court might find its disclaimers from liability unenforceable, at least in part. The agreement specifies that "[t]o the extent that statute or case law does not prohibit releases for negligence, this release is also for negligence on the part of the Club, its agents, and employees." However, "[i]f any portion of this release from liability shall be deemed by a Court of competent jurisdiction to be invalid, then the remainder ... shall remain in full force and effect and the offending provisions severed[.]" The agreement says nothing about conduct more egregious than ordinary negligence, such as recklessness or palpably unreasonable conduct. As the drafter of the document, Powerhouse bears the risk of its omissions and ambiguities being construed against it. In re Estate of Miller, 90 N.J. 210, 221, 447 A.2d 549 (1982). In any event, a more explicit attempt to immunize itself from conduct rising above mere negligence *509 would have been void as a matter of public policy.[7]
On the other hand, we are satisfied that, at least with respect to equipment being used at the club in the course of an exercise class or other athletic activity, the exculpatory agreement's disclaimer of liability for ordinary negligence is reasonable and not offensive to public policy. Absent such a disclaimer, we can readily envision health clubs being sued routinely for accidents that are commonly apt to arise in the course of recreational sporting matches or from the routine wear-and-tear of exercise machines. However, we do not reach other issues beyond the facts of this case, such as the enforceability of the waiver as to hazards posed by other equipment on the premises not routinely used for exercising. See, e.g., Leon, supra, 61 Cal.App.4th at 1235, 71 Cal.Rptr.2d 923 (holding that a health club's exculpatory agreement did not apply to an injury caused when a sauna bench collapsed, as the incident had "no relation to an individual's participation in a ... fitness regimen"). Nor do we reach the validity of other aspects of the exculpatory agreement affecting premises liability concerns, such as the attempted disclaimer concerning dangerous conditions in the club's parking lot.
Having resolved that the agreement protects Powerhouse from suit regarding unsafe exercise equipment only where its acts or omissions do not exceed ordinary negligence, we consider whether summary judgment was properly granted by the trial court. Viewing the record in a light most favorable to plaintiff, we concur with defendant that there is no genuine issue indicating that Powerhouse's oversights, if any, regarding the spinning bike went beyond simple negligence.
As we have already mentioned, the exact method by which the handlebars became detached is not known. Plaintiff's own liability expert does not accuse Powerhouse of any egregious or reckless omissions. It may well be that, as defendant's expert engineer pointed out, the real problem may have been the design of the spinning bike itself, and the difficulty of a person readily observing that the handlebar pin was not engaged and secured. The fact that the class instructor may not have checked or tightened plaintiff's handlebars does not amount to anything worse than an unfortunate and perhaps careless omission, not a reckless or extreme deviation. Likewise, if, hypothetically, the pin was left in a non-secure position overnight by the club's maintenance or cleaning crew, that only would comprise an isolated act of simple negligence.[8] There are also *510 no proofs before us of any chronic or repetitive patterns of inattention to the safety of the equipment. No other scenarios are realistically presented by this record to surmount the ordinary-negligence barrier.
For all of these reasons, the trial court's order granting summary judgment to Powerhouse is affirmed.
NOTES
[1] We shall refer to the defendant fitness club as "Powerhouse."
[2] We were only supplied with limited excerpts of plaintiff's deposition in the appellate record.
[3] It is unclear from the papers before us exactly what happened with the claims against ABI, although the transcripts show that ABI was not represented at oral arguments on Powerhouse's dispositive motion. In any event, no one is asserting that ABI is still a party to the case.
[4] Information regarding The President's Council on Physical Fitness and Sports is available at: http://www.fitness.gov.
[5] See generally New Jersey Council on Physical Fitness and Sports, http://www.nj.gov/ health/fhs/njcpfs/index.shtm/ (discussing the importance of exercise in preventing diseases such as Type 2 diabetes).
[6] We are not bound, at least in the particular context before us, by the panel's observation in Tessler, supra, 203 N.J.Super. at 485, 497 A.2d 530, that "an exculpatory clause which bars suit for negligent performance also bars suit for very negligent or grossly negligent performance." That comment in Tessler is placed into question by the passages that we have quoted from the Supreme Court's majority and dissenting opinions in Hojnowski, including the dissent's explicit reference to "gross negligence." 187 N.J. at 333, 347, 901 A.2d 381. In any event, even if we adjust our nomenclature and refer to conduct more severe than ordinary negligence, not as "gross negligence," but as "reckless," or "palpably unreasonable," or "willful and wanton," essentially the same result obtains: that the exculpatory agreement does not and should not insulate dangerous conduct that is more culpable than ordinary negligence or carelessness. See also Monaghan v. Holy Trinity Church, 275 N.J.Super. 594, 599, 646 A.2d 1130 (App.Div.1994) ("[n]egligence differs from gross negligence only in degree, not in kind"). Although we have previously observed that "degrees of negligence have been abandoned in New Jersey," "the term `gross negligence' continues to be used to describe[ ] the upper reaches of negligent conduct." Parks v. Pep Boys, 282 N.J.Super. 1, 17 n. 6, 659 A.2d 471 (App.Div. 1995). To avoid semantic confusion, we will eschew using the term "gross negligence," and instead utilize other words connoting egregiousness.
[7] We discern nothing in our opinion in Marcinczyk, supra, 406 N.J.Super. at 608, 968 A.2d 1205, to compel a different conclusion here. That case involved an exculpatory release from liability for injuries arising at a police training facility. The plaintiff was hurt, not by an equipment malfunction, but by falling when he was complying with an order to lift a heavy cooler up a flight of stairs. The panel's opinion in Marcinczyk addressed the release's applicability only to claims for negligence, not more severe conduct such as reckless behavior. Id. at 628, 968 A.2d 1205. Had such more severe conduct by the defendant been alleged, we expressed "doubt" about the agreement's enforceability. Id. at 628 n. 13, 968 A.2d 1205. We also regard the public interest analysis in that case  involving "the eroding impact of potential lawsuits interfering with police training," id. at 622, 968 A.2d 1205, and the particularized mandates of the Police Training Act, N.J.S.A. 52:17B-66 to -77.6as inapplicable to the setting here, which concerns the safety of equipment provided in a health club open for membership to the general public.
[8] We also envision the possibility that plaintiff herself might have readjusted the pin from a secure position.