5 A.3d 785 (2010)
203 N.J. 586
Raymond MARCINCZYK and Erin Marcinczyk, Plaintiffs-Appellants,
v.
STATE OF NEW JERSEY POLICE TRAINING COMMISSION, Defendants, and
County of Somerset, Somerset County Police Academy, Raritan Valley Community College, Executive Director Richard Celeste, Detective Lieutenant Peter Lubas, Detective John Russo, Detective Judith Polhill, and Detective William Loften, Defendants-Respondents.
A-19 September Term 2009.
Supreme Court of New Jersey.
Argued January 20, 2010.
Decided October 18, 2010.
*786 John R. Lanza argued the cause for appellants (Lanza & Lanza, attorneys; John E. Lanza and Kenneth W. Thomas, Flemington, on the brief).
Scott D. Rodgers, Deputy County Counsel, argued the cause for respondents (Thomas C. Miller, Somerset County Counsel, attorney).
Justice LONG delivered the opinion of the Court.
At issue on this appeal is the validity of an exculpatory agreement that a police recruit was required to execute by the Somerset County Police Academy (Academy) as a condition of participation in the Academy's training program. The recruit was injured during the training and filed a lawsuit claiming a dangerous condition of *787 property and inadequate supervision. In response, the Academy successfully invoked the exculpatory agreement on its motion for summary judgment and the Appellate Division affirmed.
We now reverse and remand. We hold that the exculpatory agreement is invalid because it contravenes public policy as expressed in the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 59:12-3 (Tort Claims Act).

I.
Because this case comes to us on a grant of summary judgment, we view the facts in a light most favorable to the non-moving party. R. 4:46-2. So viewed, they are as follows: Plaintiff Raymond Marcinczyk was employed as a groundskeeper by the University of Medicine and Dentistry of New Jersey (UMDNJ) when a job opened up in security. He applied for the position and was appointed as a security officer at the beginning of 2003. In late 2003 he was promoted to the position of police officer.
Marcinczyk's appointment was conditioned on his attendance at a police academy for training as required under N.J.S.A. 52:17B-68 of the Police Training Act, N.J.S.A. 52:17B-66 to -77.12, and N.J.S.A. 18A:6-4.4. N.J.S.A. 52:17B-68 mandates that any person seeking permanent appointment as a police officer must complete a police training course at a school approved by the State of New Jersey Police Training Commission (Police Training Commission). Such person may hold a probationary appointment in the interim. N.J.S.A. 52:17B-69. Every law enforcement agency is required to provide a newly-appointed officer with a leave of absence with pay to attend basic training. Ibid. A similar statute requires that any person appointed as a police officer for a public educational institution must complete a training course at a school approved by the Police Training Commission. N.J.S.A. 18A:6-4.4.
Pursuant to the statutory mandate, UMDNJ selected an approved school, the Academy, for Marcinczyk's training. The Academy is operated by the Somerset County Prosecutor's Office at Raritan Valley Community College. It is directed by Richard Celeste and supervised, to a large extent, by members of the Somerset County Prosecutor's Office.
In order to attend the Academy, Marcinczyk, along with all other recruits, was required to execute an exculpatory agreement, which stated, in relevant part:
I understand that certain aspects of the training at the Somerset County Police Academy present a risk of possible physical or psychological injury. Nevertheless, I choose voluntarily to participate in these programs.
....
In consideration of all of the above, I agree for myself, my heirs, dependents or personal representatives not to assert any claim or suit for money damages against the County of Somerset, Office of the County Prosecutor, the Somerset County Police Academy or [its] personnel, for pain or suffering, medical expenses, loss of wages, injuries, permanent disabilities or pecuniary losses by reason of any injuries or losses I or my heirs or dependents may sustain during or as a result of my training or participation in activities conducted by the Somerset County Police Academy.
Director Celeste testified during discovery that it is mandatory that recruits sign the agreement and that if a recruit refuses to sign the document his application to the Academy would be rejected.
In training, Marcinczyk was designated as one of two "lunch recruits," which *788 meant that he and another trainee were required to carry a seventy-pound cooler containing the lunches of all recruits from location to location during the course of the program. According to Marcinczyk, on February 23, 2004, as he and the other lunch recruit were proceeding up a staircase with the cooler, he slipped on "some kind of substance" on the steps and fell, as a result of which he suffered severe and disabling back injuries.
Marcinczyk filed a complaint against the Academy, its director and supervisors, the Police Training Commission, the State, Somerset County, and Raritan Valley Community College; his wife, Erin, sued per quod. The complaint alleged that the stairway on which Marcinczyk fell was in a dangerous condition and that defendants negligently supervised and trained their recruits, as a result of which he sustained his injuries.
Based on the exculpatory clause, defendants moved to dismiss the complaint. They also asserted immunity from suit based on the "discretionary immunity" provisions of the Tort Claims Act, N.J.S.A. 59:2-3(a) and 59:3-2(a), and maintained that the facts did not support a claim of negligence. The motion judge agreed with all of those arguments and granted summary judgment dismissing the complaint. Prior to the entry of that judgment, summary judgment was granted in favor of the Police Training Commission and the State. That order is not before us. Thus, "defendants" are Somerset County, Raritan Valley Community College, the Academy, and its director and supervisors.
Marcinczyk appealed and the Appellate Division affirmed, based solely on the exculpatory clause. Marcinczyk v. Police Training Comm'n, 406 N.J.Super. 608, 627-29, 968 A.2d 1205 (App.Div.2009). The panel held that the exculpatory agreement covered injuries sustained during lunch recruit duty and that there was no policy reason to decline enforcement of the agreement. Ibid. The court did not reach defendants' remaining claims. We granted Marcinczyk's petition for certification. Marcinczyk v. Police Training Comm'n, 200 N.J. 370, 982 A.2d 457 (2009). Defendants filed a protective cross-petition asking that, in the event that the exculpatory clause is invalidated, we address their additional defenses that the Appellate Division did not consider.

II.
Marcinczyk argues that the exculpatory clause is invalid because there is a public interest in protecting the safety of recruits; defendants have a legal duty to do so; the agreement is unconscionable because it is a contract of adhesion that grew out of unequal bargaining power; and the Tort Claims Act occupies the field of public entity liability and does not permit exculpatory waivers. Defendants counter that the public interest in rigorous police training requires enforcing the agreement; the Academy was under no legal duty to accept Marcinczyk's recruit application; there was no unequal bargaining power because Marcinczyk understood and signed the agreement without protest; and the Tort Claims Act is not preemptive.[1]

III.
A basic tenet of our law is the doctrine of freedom of contract. Fivey v. Pa. R.R., 67 N.J.L. 627, 52 A. 472 (E. & A.1902). Pursuant to that doctrine, parties *789 bargaining at arms-length may generally contract as they wish, Whalen v. Schoor, DePalma & Canger Group Inc., 305 N.J.Super. 501, 505, 702 A.2d 1311 (App.Div.1997) (citations omitted), 11 Williston on Contracts § 30.9 (Lord ed., 4th ed.1999), subject only to traditional defenses such as fraud, duress, illegality or mistake, Rudbart v. North Jersey Dist. Water Supply Comm'n, 127 N.J. 344, 353, 605 A.2d 681, cert. denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992). In the absence of those defenses, such a contract is fully binding because the parties are "conclusively presumed" to understand and assent to its legal effect. Id. at 353, 605 A.2d 681 (citations omitted).
Contracts that purport to exculpate a party from its future carelessness are subject to special rules. To begin with, they are disfavored, Hojnowski v. Vans Skate Park, 187 N.J. 323, 333, 901 A.2d 381 (2006) (citations omitted), 11 Williston on Contracts, supra, § 30.9, essentially because they violate the aims underlying our tort law: deterrence of careless behavior and compensation by the wrongdoer for injuries sustained by victims, Fu v. Fu, 160 N.J. 108, 123, 733 A.2d 1133 (1999). As a result, exculpatory contracts are closely scrutinized and must clearly and unambiguously reflect the
unequivocal expression of the party giving up his or her legal rights that this decision was made voluntarily, intelligently and with the full knowledge of its legal consequences. Knorr v. Smeal, 178 N.J. 169, 177 [836 A.2d 794] (2003); Country Chevrolet, Inc. v. Township of N. Brunswick Planning Bd., 190 N.J.Super. 376, 380 [463 A.2d 960] (App. Div.1983). Any doubts or ambiguities as to the scope of the exculpatory language must be resolved against the drafter of the agreement and in favor of affording legal relief. Ultimate Computer Servs., Inc. v. Biltmore Realty Co. Inc., 183 N.J.Super. 144 [443 A.2d 723] (App. Div.), certif. denied, 91 N.J. 184 [450 A.2d 522] (1982) (upholding an exculpatory clause limited to commercial tenancies).
[Gershon v. Regency Diving Ctr., Inc., 368 N.J.Super. 237, 247, 845 A.2d 720 (App.Div.2004).]
See also Restatement (Second) of Torts § 496B comment c (1965). No such doubts emerge from the language of the exculpatory agreement required of Marcinczyk. It immunizes defendants absolutely from any and all losses flowing from injuries sustained by Marcinczyk "during or as a result of [his] training."
That is not the end of the inquiry. Even if unambiguous, it is well-established that exculpatory contracts will not be enforced where they are contrary to public policy. Stelluti v. Casapenn Enter., LLC, 203 N.J. 286, 303 (2010); Mayfair Fabrics v. Henley, 48 N.J. 483, 487-88, 226 A.2d 602 (1967); Hy-Grade Oil Co. v. New Jersey Bank, 138 N.J.Super. 112, 116-17, 350 A.2d 279 (App.Div.1975), certif. denied, 70 N.J. 518, 361 A.2d 532 (1976). See also Restatement (Second) of Torts, supra, § 496B ("A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy.") (emphasis added).
Under our law,
[a]n agreement is against public policy if it is injurious to the interest of the public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or ... is at war with the interests of *790 society and is in conflict with public morals.
[Frank Briscoe Co. v. Travelers Indem. Co., 65 F.Supp.2d 285, 312 (D.N.J.1999) (citation and internal quotations omitted).]
In other words, contractual provisions that tend to injure the public in some way will not be enforced. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 403-04, 161 A.2d 69 (1960) (citation omitted). Because public policy is made up of principles regarded by the legislature or by the courts as being of fundamental concern to society, we look to legislation and judicial opinions as sources of public policy. Stelluti, supra, 203 N.J. at 318, 1 A.3d 678 (Albin, J., dissenting); Henningsen, supra, 32 N.J. at 404, 161 A.2d 69 (recognizing constitution, statutes, and judicial decisions as repositories of public policy).

IV.
The source of public policy in this case is a statutethe Tort Claims Act, which was passed in response to the judicial abrogation of sovereign immunity, Willis v. Department of Conservation & Economic Development, 55 N.J. 534, 540-41, 264 A.2d 34 (1970), and which reestablished the rule of immunity for public entities and public employees, with certain limited exceptions. Vincitore v. N.J. Sports & Expo. Auth., 169 N.J. 119, 124, 777 A.2d 9 (2001).[2]See, e.g., N.J.S.A. 59:2-1(a) ("Except as otherwise provided by this [A]ct, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person") (footnote omitted); but see N.J.S.A. 59:4-2 ("A public entity is liable for injury caused by a ... dangerous condition" of property under stated conditions). Different but equally specific rules apply to public employees. See N.J.S.A. 59:3-1 to -14.
In crafting the scheme, the drafters "recognize[d] the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity." N.J.S.A. 59:1-2. At the same time, the Legislature declared that it was acutely aware of the scope of the "area within which government has the power to act for the public good" and determined that public entities "should not have the duty to do everything that might be done." Ibid. Balancing those competing interests, the Legislature carefully outlined a design of broad immunity and limited liability, and declared that it is "the public policy of this State that public entities shall only be liable for their negligence within the limitations of this [A]ct and in accordance with the fair and uniform principles established herein." Ibid. (emphasis added).[3]
The question here is whether a public entity can condition the provision of a public service on the recipient's execution of a waiver of liability. The answer is that it cannot, because such a waiver violates the public policy expressed by the Legislature in the Tort Claims Act.
In essence, the Tort Claims Act has three aims: to protect public entities and public employees from constant legal onslaught in recognition of the breadth of *791 their public responsibilities; to permit injured citizens to seek recompense from public entities for negligence in narrowly defined circumstances; and to avoid a piece-meal approach and impose some order on the subject.
In the delicate balance that is the Tort Claims Act, the Legislature achieved those goals by generally re-imposing immunity for public entities but carving out narrow exceptions for which it determined liability should attach and in connection with which citizens should be entitled to file a claim. Those exceptions constitute a policy judgment regarding the areas in which a public entity or a public employee should be required to answer for their violations of the standard of care. Indeed, the Legislature declared its judgment to be the "public policy of this State." N.J.S.A. 59:1-2.
That said, defendants' effort to extract a complete exculpatory waiver from police academy trainees fails because it confounds those carefully crafted provisions of the Tort Claims Act. Indeed, compelled exculpatory waivers directly thwart the policies embodied in the Tort Claims Act by immunizing public entities from liability for conduct for which the Legislature intended them to answer; by depriving our citizens of a statutorily-authorized remedy; by effectively reestablishing common law sovereign immunity, which the Tort Claims Act was crafted to leaven; and by introducing randomness into a scheme that was intended to be uniform.
As public entities lack the power to expand their liability by contract, Kepler v. Taylor Mills Developers, Inc., 357 N.J.Super. 446, 453, 815 A.2d 988 (App. Div.2003) ("[t]hese immunities, so stoutly re-established by the Legislature, cannot be thwarted or waived other than by a legislative enactment of equal dignity"), so are they barred from granting themselves greater immunity than the Legislature has afforded them. Howe v. Douglas County, 146 Wash.2d 183, 43 P.3d 1240, 1244 (2002) (holding county's conditioning of building permit on exculpatory waiver violates Legislature's statutory abolition of sovereign immunity). In short, the exculpatory waiver cannot stand, insofar as it contravenes our public policy as expressed in the Tort Claims Act, which occupies the field of public entity liability.

V.
In reaching a contrary conclusion, the Appellate Division went astray in two ways. First, it substituted its own vision of public policy for that of the Legislature when it concluded that the exculpatory clause serves the public interest because it frees defendants from fears of litigation which might cause them to water down the rigor of the training program. The problem with that conclusion is not in its illogic but in the fact that the Legislature has made a contrary judgment in modifying the law of sovereign immunity.
Indeed, in the Tort Claims Act, the Legislature declared that it understood the problems lawsuits pose for public entities and particularly for entities involved in law enforcement. As a result, it provided broad but not absolute immunity for all public entities and specifically addressed particularized actions of law enforcement entities and officials. See, e.g., N.J.S.A. 59:5-1 (immunizing law enforcement officials for failure to provide penal or correctional facilities, equipment, or personnel); N.J.S.A. 59:5-2 (immunizing law enforcement officials from claims caused by escaping prisoner, person resisting arrest, or enforcement officer's pursuit of person); N.J.S.A. 59:5-4 (immunizing law enforcement officials for failure to provide police protection). In that carefully crafted scheme, the Legislature did not extend absolute immunity to entities providing police *792 training, presumably because it did not view them as entitled to such immunity. It was not for the appellate panel to second guess that judgment.
The other error in the Appellate Division's analysis was its too crabbed view of public policy as embodied in our statutes. Apparently the panel believed that only if a specific safety statute was violated would an exculpatory agreement be contrary to public policy, thus warranting invalidation:
We emphasize, however, that we would view the matter differently if a specific affirmative regulation applied to plaintiff's circumstances. For example, if plaintiff suffered a head injury while engaging in nightstick training without a helmetand a regulation prohibited instructors from requiring trainees to engage in nightstick training without a helmetthat would be an area of negligence to which the Academy's exculpatory agreement would not apply. In other words, a helmet requirement would be the type of "positive duty" that would preclude enforcement of an exculpatory agreement, not, as here, a guideline or regulation merely urging police instructors to conduct safe training.
[Marcinczyk, supra, 406 N.J.Super. at 625-26, 968 A.2d 1205.]
That analysis falls short insofar as it fails to recognize that an expression of public policy in our law need not involve a specific duty, safety or otherwise. To be sure, as we said in McCarthy v. NASCAR Inc., immunizing a party from liability for a violation of a specific safety statute will not be tolerated. But our courts have taken a much broader approach to the concept. 48 N.J. 539, 543, 226 A.2d 713 (1967). Indeed, often "legislation is significant, not as controlling the disposition of the case, but as enlightening the court concerning some specific policy to which it is relevant." Restatement (Second) of Contracts § 179 comment b (1981).
Thus, for example, in Muhammad v. County of Rehoboth Beach, we addressed a waiver in an arbitration agreement under the standards applicable to exculpatory clauses, and declined to enforce it because it deprived plaintiff of an available, but not mandated, class-action mechanism to vindicate her consumer rights. 189 N.J. 1, 22, 912 A.2d 88 (2006), cert. denied, 549 U.S. 1338, 127 S.Ct. 2032, 167 L.Ed.2d 763 (2007). Likewise, in Gershon, supra, the Appellate Division properly invalidated an exculpatory waiver because it eliminated plaintiff's access to the remedies available in the Wrongful Death Act. 368 N.J.Super. at 249, 845 A.2d 720. In the narrowest sense, this case is an analogue to Muhammad and Gershon insofar as the exculpatory waiver would deprive injured citizens of the right to seek recompense against public entities in the circumstances specifically contemplated by the Tort Claims Act. More importantly, Muhammad and Gershon implicated neither a direct statutory conflict nor the negation of a specific statutory safety duty, and yet resulted in non-enforcement. That is important because it reflects our view that an expression of public policy sufficient to warrant vitiation of an exculpatory agreement is not so limited and certainly incorporates the detailed legislative provisions in the Tort Claims Act.

VI.
Our decision not to enforce the exculpatory clause does not expose the defendants to broad liability. As we have said, the Tort Claims Act "reestablished the general rule of immunity but created narrow exceptions to that rule." Vincitore, supra, 169 N.J. at 124, 777 A.2d 9 (citations omitted). Thus, the invalidation of the agreement here merely makes way for the operation *793 of the immunities in the Tort Claims Act and, in particular, for the narrow exception to immunity that is present in the pleadings in this casenegligent supervision in connection with ministerial duties, N.J.S.A. 59:2-3, N.J.S.A. 59:3-2.[4] Under the Tort Claims Act, defendants must answer that contention.
However, because the Appellate Division determined that the exculpatory clause was valid, it did not reach the remaining defenses asserted under the Tort Claims Actdiscretionary immunity. N.J.S.A. 59:2-3(a); N.J.S.A. 59:3-2(a). Nor did it address the issue of whether Marcinczyk made out a prima facie negligence claim. Defendants raised those issues in a protective cross-petition, which we now grant. We remand those issues to the Appellate Division for disposition. This opinion makes it unnecessary for us to address Marcinczyk's alternative challenges to the agreement.

VII.
The judgment of the Appellate Division is reversed. The matter is remanded in accordance with the principles to which we have adverted.
Chief Justice RABNER and Justices ALBIN and WALLACE join in Justice LONG's opinion. Justice LaVECCHIA filed a separate dissenting opinion in which Justices RIVERA-SOTO and HOENS join.
Justice LaVECCHIA, dissenting.
I would affirm the judgment of the Appellate Division, enforcing the agreement between the parties that barred negligence claims as a condition of a police recruit's participation in the police training program. Marcinczyk v. N.J. Police Training Comm'n, 406 N.J.Super. 608, 968 A.2d 1205 (2009). As the panel's decision observed, exculpatory agreements are not prohibited, though subjected to close scrutiny. Id. at 616, 968 A.2d 1205. We stated and applied that principle in our opinion last Term in Stelluti v. Casapenn Enters., LLC, 203 N.J. 286, 1 A.3d 678 (2010), when we enforced an exculpatory agreement in respect of a claim based in simple negligence.
Key to the enforcement of an exculpatory clause within an agreement is whether the particular limitation on liability would violate public policy. Marcinczyk, supra, 406 N.J.Super. at 616, 968 A.2d 1205 (citation and quotation marks omitted). As the panel below noted,
courts have refused to enforce such agreements if the party benefiting from exculpation is subject to a positive duty imposed by law or is imbued with a public trust, or if exculpation of the party would adversely affect the public interest. And our courts will not enforce an exculpatory agreement that would release tort liability resulting from intentional or reckless conduct.
[Ibid. (internal citations and quotation marks omitted).]
The court thereupon analyzed the exculpatory agreement in this matter and found no reason not to enforce the agreement's bar against the recruit's negligence claim premised on injuries sustained while carrying a cooler filled with lunches for fellow recruits. It bears emphasis that reckless or intentional conduct was not implicated in the complaint filed by the parties. Accordingly, addressing all the relevant criteria when considering such a claim brought *794 in the face of an exculpatory agreement, the panel found that the agreement did not negatively impact the public interest,[1] did not negate a statutory duty, and was not unconscionable. Id. at 613, 968 A.2d 1205. It therefore was valid and enforceable and operated to bar the plaintiffs' negligence claims, ibid., a conclusion with which I agree.
My colleagues in the majority, however, reach a different conclusion. Advancing an objection to this exculpatory agreement's bona fides that was not raised heretofore, the majority turns the Tort Claims Act, N.J.S.A. 59:1-1 to 12-3 (TCA or "the Act"), with its reassertion of sovereign immunity, and its procedures establishing how and under what conditions a claim may be advanced against a public entity in this State, into a positive duty: to be liable in suit in negligence. See ante at 203 N.J. 586, 594-97, 5 A.3d at 790-91. By such means, the majority declares the exculpatory agreement at issue in this matter to be contrary to public policy. In my view, the majority's use of the Act turns it on its head.
The history to the TCA is well known. See Rochinsky v. State Dep't of Transp., 110 N.J. 399, 404-11, 541 A.2d 1029 (1988) (tracing TCA's enactment and structural design). After this Court abrogated the common law doctrine of sovereign immunity to tort claims, see Willis v. Dep't. of Conservation & Econ. Dev., 55 N.J. 534, 540, 264 A.2d 34 (1970), the Legislature responded surely and swiftly. Through enactment of the TCA, the Legislature broadly re-imposed sovereign immunity. See N.J.S.A. 59:2-1(a) ("Except as otherwise provided by this act, a public entity is not liable for an injury"); see also Polzo v. County of Essex, 196 N.J. 569, 578, 960 A.2d 375 (2008) (describing Act's "guiding principle, that is, that immunity from tort liability is the general rule and liability is the exception") (internal citations and quotation marks omitted); Rochinsky, supra, 110 N.J. at 407, 541 A.2d 1029 (identifying immunity as Act's "overriding objective"). Moreover, the TCA declared that "[a]ny liability of a public entity established by this act is subject to any immunity of the public entity and is subject to any defenses that would be available to the public entity if it were a private person." N.J.S.A. 59:2-1(b). The Legislature thereupon delineated when a public entity may be held liable and set the conditions on how to bring suit. That said, through the adoption of narrow exceptions to the reestablished norm of sovereign immunity, the TCA does not purport to devolve a form of "positive duty" on public entities. Rather, the legislative history to the TCA reveals the distinctly different, focused purpose to broadly assert sovereign immunity, to have the exceptions to the re-establishment of immunity interpreted narrowly and in favor of public entities, and to establish the procedural conditions to pursuit of a tort suit against a public entity. Rochinsky, supra, 110 N.J. at 404-09, 541 A.2d 1029.
Moreover, the Act explicitly states the intention to put public entities on the same footing as private entities with respect to certain liabilities. See N.J.S.A. 59:2-1(b). Private entities can limit and circumscribe those liabilities through the use of various risk-shifting provisions, such as exculpatory clauses and indemnification agreements. Nothing in the Act specifically prohibits public entities from doing the same. The *795 question is why should we construct such a barrier when the Legislature has not chosen to do so.
I am at a loss to see how the Act's careful structure limiting one's right to pursue a tort action against a public entity can be flipped to support the premise that a public entity cannot take further steps to contain its risks. In my view, the TCA's principles cannot be logically extended so, and I find no support within the Act to support a conclusion that the Legislature intended to preclude public entities from entering into agreements, with willing participants, that result in a limitation on liability for negligent acts in connection with certain activities.[2]
These are difficult times for government, particularly in terms of governmental finances. Governments at all levels are under pressure to contain costs. In areas such as are involved here, cost containment means containment of risk. Exculpatory agreements have historically been used in the private sector as a means to contain and allocate risk. Here a county governmental entity sought to avail itself of that mechanism to contain cost in respect of its police training program. Private entities have such a right and I discern no prohibition from the same imposed on public entities based on the letter or the spirit of the TCA.
In sum, the preclusive effect that the majority teases out of the TCA appears antithetical to our prior expressions about the Act's purpose and the manner in which it is to be construed, namely in favor of immunity and narrowly on issues relating to liability. See, e.g., Polzo, supra, 196 N.J. at 578, 960 A.2d 375. Moreover, the majority's determination ignores the Act's stated intention that public entities should be entitled to avail themselves of defenses to liability that the private sector may employ. Instead of allowing government to enter into voluntary agreements to contain risk by limiting liability, agreements that a private party would be permitted to execute, the majority ties the hands of public entities and of the public they represent.
I respectfully dissent.
Justices RIVERA-SOTO and HOENS join in this opinion.
For reversal and remandmentChief Justice RABNER, Justices LONG, ALBIN and WALLACE4.
For affirmanceJustices LaVECCHIA, RIVERA-SOTO and HOENS3.
NOTES
[1] The parties are sharply divided over whether the exculpatory waiver is a contract of adhesion. We do not resolve the question of whether the agreement was adhesive, because it must be invalidated on other grounds.
[2] It is uncontroverted that defendants are public entities and public employees as defined in N.J.S.A. 59:1-3.
[3] N.J.S.A. 59:2-1 permits courts to "`continue to recognize common law immunities to the extent they are consistent with the provisions of this act.'" Margolis & Novak, Claims Against Public Entities, comment 5(c) to N.J.S.A. 59:2-1 (2010) (quoting 1972 Task Force Comment to N.J.S.A. 59:2-2) (emphasis omitted); see also Norris v. Borough of Leonia, 160 N.J. 427, 438, 734 A.2d 762 (1999).
[4] Although Marcinczyk's complaint also asserted liability based on the "dangerous condition" of property, N.J.S.A. 59:4-2, he has abandoned any claims arising from the theory of premises liability.
[1] The panel concluded that the agreement served a valid public concern, noting the need to have rigorous police training. The panel described the agreement as one that acted to prevent the eroding impact of potential lawsuits from interfering with police training. Moreover, the agreement did not purport to immunize reckless or intentionally tortious behavior.
[2] The assertion that the public entity here is performing a service that can only be obtained from government is unsupported in this record. Having not been argued as such, nor factually supported, I will not address this appeal as though we were confronted with a situation in which government was the sole source of a necessary service.